**Slip Op. 07-168**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JINAN YIPIN CORPORATION, LTD., and SHANDONG HEZE INTERNATIONAL TRADE AND DEVELOPING COMPANY,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC.,**<br><br>Defendant-Intervenors. | **Before: Timothy C. Stanceu, Judge**<br><br>**Consol. Court No. 04-00240**<br><br>**PUBLIC**[*] |

## OPINION AND ORDER

[Remanding for redetermination the United States Department of Commerce's final results in an administrative review of an antidumping duty order on fresh garlic from the People's Republic of China]

Dated: November 15, 2007

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Bruce M. Mitchell*, *Mark E. Pardo, Richard A. Burns*, and *Paul G. Figueroa*) for plaintiff Jinan Yipin Corporation, Ltd.

*Lee & Xiao* (*Yingchao Xiao*) for plaintiff Shandong Heze International Trade and Developing Company.

*Peter D. Keisler*, Acting Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Richard P. Schroeder* and *Mark T. Pittman*); *Scott D. McBride* and

---

[*] With the consent of the parties, this public version is being issued without the redaction of any information contained in the confidential version of this Opinion and Order.

*Amanda L. Blaurock*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Kelley Drye Collier Shannon* (*Michael J. Coursey* and *Adam H. Gordon*) for defendant-intervenors Fresh Garlic Producers Association, Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.

Stanceu, Judge: Plaintiffs Jinan Yipin Corporation, Ltd. ("Jinan Yipin") and Shandong Heze International Trade and Developing Company ("Shandong") contest certain aspects of a final determination ("Final Results") issued by the International Trade Administration, United States Department of Commerce ("Commerce" or "the Department") in the eighth administrative review of the antidumping duty order on fresh garlic ("subject merchandise") imported from the People's Republic of China ("China" or the "PRC"). *See Fresh Garlic From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 69 Fed. Reg. 33,626 (Jun. 16, 2004) ("*Final Results*").[1] Before the court are Jinan Yipin's and Shandong's motions for judgment upon the agency record under USCIT Rule 56.2.

In support of its motion, plaintiff Jinan Yipin contends that Commerce acted contrary to law: (1) in applying, through the use of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e (2000), an antidumping duty rate of 376.67 percent to the sales of subject merchandise that Jinan Yipin's U.S. sales affiliate made to "Houston Seafood," one of its customers in the United States, based on possible affiliation between Jinan Yipin and Houston Seafood; (2) when, in calculating the U.S. affiliate's indirect selling expenses, Commerce

---

[1] Commerce defined the scope of the order to encompass "all grades of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen, provisionally preserved, or packed in water or other neutral substance, but not prepared or preserved by the addition of other ingredients or heat processing." *Final Results* at 33,627. Commerce noted that "[t]he differences between grades are based on color, size, sheathing, and level of decay." *Id.*

increased the indirect selling expenses reported by Jinan Yipin based on a resort to facts otherwise available and adverse inferences; (3) in adjusting the selling price of Jinan Yipin's subject merchandise for certain inspection fees which, according to plaintiffs, would not have been incurred but for the existence of the antidumping duty order; and (4) in determining surrogate values for garlic seed, water, and packing cartons.[2]  Jinan Yipin's Rule 56.2 Mot. for J. Upon the Agency R. ("Jinan Yipin's Mot."); Br. in Supp. of Jinan Yipin's Rule 56.2 Mot. for J. Upon the Agency R. 2-4 ("Jinan Yipin's Br. in Supp.").  Plaintiff Shandong, an exporter of subject merchandise, joins in Jinan Yipin's arguments challenging the determination of surrogate values for garlic seed, water, and packing cartons.  Shandong Heze's Rule 56.2 Mot. for J. Upon the Agency R. 1-2 ("Shandong's Mot."); Shandong Heze's Letter in Supp. of Jinan Yipin's Rule 56.2 Mot. for J. Upon the Agency R. 1.

Defendant United States argued initially that the Final Results are fully in accordance with law and therefore should be sustained in all respects.  Def.'s Mem. in Opp'n to Pls.' Rule 56.2 Mots. for J. Upon the Agency R. 1 (Def.'s Mem. in Opp'n).  In a post-hearing submission, defendant changed its apparent position with respect to the issue of possible affiliation between Jinan Yipin and Houston Seafood, requesting that the court grant a voluntary remand for the limited purpose of allowing Commerce to investigate that issue further.  Def.'s Supplemental Br. in Resp. to the Court's Questions of May 22, 2006 at 2 ("Def.'s Supplemental

---

[2] Jinan Yipin stated a claim concerning the Department's surrogate value for ocean freight in its complaint but omitted this claim from the issues that it presented for judicial review in its brief in support of its motion for judgment on the agency record, in which it expressly declined to address the issue.  *See* Jinan Yipin's Br. in Supp. 2-4, 61.  Therefore, Jinan Yipin's motion under Rule 56.2 does not raise before the court a claim pertaining to the surrogate value of ocean freight.  *See* USCIT R. 56.2(c).

Br."). Jinan Yipin opposes such a remand. Reply of Jinan Yipin to Def.'s Post-Hearing Br. 9-10 ("Jinan Yipin's Reply to Def.'s Supplemental Br.").

Fresh Garlic Producers Association and its individual members, Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc. (collectively "defendant-intervenors"), are domestic producers of garlic that were petitioners in the antidumping duty investigation resulting in the antidumping duty order. They intervened in support of the position of defendant United States in this litigation but did not submit briefs or participate in the hearing conducted by the court on plaintiffs' motion for judgment upon the agency record.

The court concludes that the Final Results are, in some respects, unsupported by substantial evidence on the agency record and otherwise contrary to law. Accordingly, the court will remand the matter to Commerce for reconsideration and redetermination in accordance with this Opinion and Order.

## I. BACKGROUND

Commerce issued its antidumping duty order on imports of fresh garlic from China in 1994. *Antidumping Duty Order: Fresh Garlic From the People's Republic of China*, 59 Fed. Reg. 59,209 (Nov. 16, 1994). In 2002, Commerce conducted a new shipper review of Jinan Yipin. In that review, Commerce determined that "[t]he weighted-average dumping margin for subject merchandise manufactured and exported by Jinan Yipin for the period November 1, 2000, through October 31, 2001 is 0.00 percent." *Fresh Garlic From the People's Republic of China: Final Results of Antidumping Duty New Shipper Review*, 67 Fed. Reg. 72,139, 72,140 (Dec. 4, 2002) ("*Jinan Yipin New Shipper Review*"). Commerce subsequently initiated the

administrative review at issue in this action, the eighth administrative review, for the period

November 1, 2001 to October 31, 2002 ("period of review" or "POR") and subjected to that

review entries of subject merchandise exported by Jinan Yipin and Shandong. *Initiation of*

*Antidumping and Countervailing Duty Admin. Reviews*, 67 Fed. Reg. 78,772, 78,772-73

(Dec. 26, 2002).

Commerce issued the preliminary results of the eighth administrative review in December

2003 ("Preliminary Results"). *See Fresh Garlic from the People's Republic of China:*

*Preliminary Results of Antidumping Duty Admin. Review and New Shipper Reviews*, 68 Fed.

Reg. 68,868 (Dec. 10, 2003) ("*Preliminary Results*"). In the Preliminary Results, Commerce

preliminarily assigned to Jinan Yipin a weighted average percentage antidumping duty margin of

168.06 percent. *Preliminary Results*, 68 Fed. Reg. at 68,873. Commerce further preliminarily

determined that Shandong did not make sales of subject merchandise below normal value for the

period of review. *Id.*

Commerce issued the Final Results in June 2004. *Final Results*, 69 Fed. Reg. 33,626.

Commerce recalculated the weighted average percentage margin for entries of Jinan Yipin's

merchandise, reducing it to 115.81 percent. *Id.* at 33,629. Contrary to the Preliminary Results,

Commerce also determined that Shandong had sold merchandise at prices below normal value.

Commerce calculated a weighted average percentage antidumping duty margin of 43.30 percent

for Shandong's merchandise. *Id.*

Jinan Yipin and Shandong each commenced an action under 19 U.S.C. § 1516a (2000) to

contest the Final Results. The court consolidated the cases. Each plaintiff moves for judgment

upon the administrative record.

## II. DISCUSSION

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000), under which the Court of International Trade is granted exclusive jurisdiction of any civil action commenced under 19 U.S.C. § 1516a.  28 U.S.C. § 1581(c).  The court reviews the Final Results on the basis of the agency record.  *See* 28 U.S.C. § 2640(b) (2000); 19 U.S.C. § 1516a(b)(1)(B)(i).  Upon such review, the court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

The court addresses below the following issues that plaintiff Jinan Yipin raised in its motion for judgment upon the agency record: (A) whether Commerce lawfully applied "facts otherwise available" and "adverse inferences" under 19 U.S.C. § 1677e when it applied an antidumping duty rate of 376.67 percent to the sales of subject merchandise made by the U.S. affiliate of Jinan Yipin to Houston Seafood; (B) whether Commerce, in calculating the U.S. affiliate's indirect selling expenses, lawfully resorted to facts otherwise available and adverse inferences to increase the indirect selling expenses reported by Jinan Yipin; (C) whether Commerce lawfully adjusted the constructed export price of Jinan Yipin's subject merchandise to account for certain inspection fees; and (D) whether Commerce lawfully determined surrogate values for garlic seed, water, and packing cartons.

Finally, the court considers Shandong's challenge to Commerce's determination of surrogate values for garlic seed, water, and packing cartons.  In this context the court addresses

defendant's arguments that Shandong's motion does not comply with the court's Rules, that

Shandong failed to exhaust its administrative remedies, and that Shandong is not entitled to relief

because Jinan Yipin's arguments are company-specific and therefore do not show that

Commerce's determinations for Shandong's factors of production are unsupported by substantial

evidence on the record.

A.  Commerce Erred in Applying a 376.67 Percent Antidumping Duty Rate to the Sales of
Jinan Yipin's Subject Merchandise to Houston Seafood

Under the antidumping laws, antidumping duty represents the amount by which the

"normal value"[3] of the imported subject merchandise exceeds the "export price"[4] or the

"constructed export price"[5] for that merchandise.  19 U.S.C. § 1673 (2000).  In an administrative

review of an antidumping duty order, Commerce is required to determine "(i) the normal value

---

[3] "Normal value" usually is determined by the price for which the "foreign like product" corresponding to the subject merchandise (generally, identical or like merchandise made by the same foreign producer in the same foreign country, as determined according to 19 U.S.C. § 1677(16) (2000)) is first sold, or offered for sale, for consumption in the exporting country. 19 U.S.C. § 1677b(a)(1) (2000).  Where, as here, the subject merchandise is produced in a nonmarket economy country, normal value is determined according to special procedures set forth in 19 U.S.C. § 1677b(c), under which normal value usually is computed based on the value of factors of production in a market economy country or countries at a level of economic development comparable to the nonmarket economy country.  *See* 19 U.S.C. § 1677b(c).

[4] "Export price" usually refers to the price at which the subject merchandise is first sold, before the date of importation into the United States, by the producer or exporter outside of the United States, to an unaffiliated purchaser in the United States, or to an unaffiliated purchaser for exportation to the United States, with certain adjustments.  19 U.S.C. § 1677a(a) (2000).

[5] The statute defines "constructed export price" as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise *or by a seller affiliated with the producer or exporter*, to a purchaser *not affiliated with the producer or exporter*, as adjusted under subsections (c) and (d) of this section."  19 U.S.C. § 1677a(b) (emphasis added).

and export price (or constructed export price) of each entry of the subject merchandise, and (ii)

the dumping margin for each such entry." *Id.* § 1675(a)(2)(A) (2000). For sales of subject

merchandise made to an unaffiliated purchaser, Commerce uses "export price." *See id.*

§ 1677a(a). For sales of subject merchandise made to an affiliated purchaser, Commerce must

determine a "constructed export price." *See* 19 U.S.C. § 1677a(b).

Jinan Yipin sold subject merchandise in the United States through an affiliated U.S. sales

company, American Yipin Produce Company ("American Yipin"). Commerce therefore was

required to determine a constructed export price. *See id.* Under § 1677a(b), Commerce was

required to determine constructed export price according to the price at which the subject

merchandise was first sold, or agreed to be sold, in the United States to a purchaser not affiliated

with Jinan Yipin, with various adjustments. *Id.* Some of Jinan Yipin's subject merchandise was

sold to Houston Seafood. Thus, determining an antidumping duty margin for the merchandise

sold to Houston Seafood required Commerce to determine whether Jinan Yipin and Houston

Seafood were "affiliated" for purposes of § 1677a(b).

To determine whether entities are affiliated, Commerce is to apply 19 U.S.C. § 1677(33),

which sets forth the statutory definition of "affiliated persons."[6] If Commerce concluded that

---

[6] The statute provides that the following persons shall be considered to be "affiliated" or "affiliated persons": "(A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants. (B) Any officer or director of an organization and such organization. (C) Partners. (D) Employer and employee. (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization. (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person. (G) Any person who controls any other person and such other person." It further provides that "[f]or purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33).

Jinan Yipin and Houston Seafood were affiliated persons under § 1677(33) when the sales to

Houston Seafood were made, Commerce then would have been required to determine

constructed export price according to the price at which the subject merchandise was first resold

to a purchaser unaffiliated with Jinan Yipin. *See id.*

The court will address the Department's findings regarding the issue of affiliation of

Jinan Yipin and Houston Seafood by considering (1) whether Commerce actually determined that

Jinan Yipin and Houston Seafood were affiliated, (2) whether Commerce supported with

substantial record evidence any findings related to a determination of such affiliation, and (3)

whether Commerce supported with substantial record evidence certain findings necessary to

support reliance on facts otherwise available and adverse inferences in determining the

antidumping duty rate for sales of subject merchandise to Houston Seafood.

1.  The Final Results Present Vague and Inconsistent Conclusions on the Issue of Affiliation
Between Jinan Yipin and Houston Seafood

The Final Results are ambiguous and vague as to whether Commerce actually determined

that Jinan Yipin and Houston Seafood were affiliated.  In its response to the Department's

questionnaire, Jinan Yipin reported the sales that American Yipin made to Houston Seafood as

sales to an unaffiliated party.  Commerce, in the Final Results, appears to have rejected that

characterization.  Commerce stated in the Final Results that Jinan Yipin did not provide "correct

and thorough responses" to Commerce's questions before, during and after verification, and that

this inadequacy related to the issue of "[w]hether Jinan Yipin reported some sales to an affiliated

party as unaffiliated-party sales . . . ." *Final Results*, 69 Fed. Reg. at 33,627.  This statement

implies that, due to alleged inadequacies in Jinan Yipin's responses to its inquiries, Commerce

was unable to determine whether Jinan Yipin and Houston Seafood were affiliated. Commerce then stated in the Final Results that to address this inadequacy, "[Commerce] selected a rate of 376.67 percent to apply as adverse facts available to Jinan Yipin's sales to an *affiliated customer* that it reported as *unaffiliated-party sales transactions*."[7] *Id.* at 33,627-628 (emphasis added) (stating further that "the Department has applied adverse facts available to the sales to Jinan Yipin's affiliated customer . . . because Jinan Yipin failed to identify affiliated parties and, in particular, *its affiliations to Houston Seafood* . . . in its questionnaire responses." (emphasis added)). This sentence, in apparent contradiction to the discussion where Commerce determined it did not have sufficient information, expresses a determination by Commerce that Jinan Yipin and Houston Seafood indeed were affiliated within the meaning of the statute and that Jinan Yipin, through a failure to respond to the best of its ability to Commerce's requests for information, incorrectly reported the sales as sales that occurred between unaffiliated entities.

In a lengthy internal memorandum ("Decision Memorandum"), which the Final Results incorporate by reference, Commerce discusses the affiliation issue but is similarly vague as to its conclusion with respect to affiliation. *Issues and Decision Mem. for the Admin. Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China* (June 7, 2004) (Admin. R. Doc. No. 254) ("*Decision Mem.*"); *see Final Results*, 69 Fed.

---

[7] Commerce uses the shorthand term "adverse facts available" to refer to two separate procedures. Specifically, the Department uses "facts otherwise available" under 19 U.S.C. § 1677e(a) when needed information is unavailable on the record or otherwise deficient according to § 1677e(a). *See* 19 U.S.C. § 1677e(a). When selecting from among the facts otherwise available, Commerce uses inferences adverse to a party that fails to cooperate by not acting to the best of its ability in responding to the Department's requests for information. *See id.* § 1677e(b).

Reg. at 33,627. The Decision Memorandum refers to another internal memorandum, the "FA

Memorandum," in stating as follows:

> The Department did *not* indicate in the *FA Memorandum* that the information
> which it discovered so late in the proceeding indicated that Houston Seafood *was
> affiliated* with American Yipin. What we did determine in the *FA Memorandum*,
> and we are clarifying in this decision, is that Jinan Yipin did not cooperate to the
> best of its ability in providing information pertaining *to all of its affiliates* during
> the POR. Thus, it is no surprise that some unanswered questions remain in the
> record of this review. This is a direct result of American Yipin's inadequate
> responses to the Department's questionnaires.

*Decision Mem.* at 75-76 (emphasis added) (citing *Fresh Garlic from the People's Republic of

China–Preliminary Results of Admin. Review for the Period Nov. 1, 2001, through Oct. 31,

2002: Use of Facts Otherwise Available for Jinan Yipin Corp., Ltd. (Jinan Yipin)* (Dec. 1, 2003)

(Admin R. Doc. No. 176) ("*FA Mem.*")). The quoted language in the Decision Memorandum

appears ambiguous because of its reference to Jinan Yipin's alleged failure to cooperate to the

best of its ability in providing information pertaining to all of its "affiliates," a term that might be

construed to include Houston Seafood.

A conclusion of actual affiliation is not equivalent to a conclusion that the Department

was unable to make an affiliation determination because of a party's inadequate responses to its

inquiries. If, for example, Commerce's theory had been that Jinan Yipin's inadequate responses

to its inquiries prevented Commerce from determining whether or not affiliation between Jinan

Yipin and Houston Seafood existed at the time that sales of subject imported garlic were made to

Houston Seafood, Commerce would have been required to satisfy the statutory requirements of

19 U.S.C. § 1677e(a) for the use of "facts otherwise available" and the requirements of 19 U.S.C.

§ 1677e(b) for treatment of the two entities as if they were affiliated, as an adverse inference.

*See* 19 U.S.C. § 1677e(a), (b).  Commerce does not unambiguously state that such was its theory; to the contrary are the several indications of a conclusion of affiliation.  A conclusion of actual affiliation, whether for all of the period of review or for some identified portion of it, could be sustained only on the basis of clearly-expressed findings of fact that are supported by substantial evidence on the record.

The court would have to engage in guesswork to decide whether Commerce found affiliation for some portion of the period of review, for all of the period of review, or not at all.  The court, therefore, lacks a single and consistent ground upon which to evaluate the Final Results.  In reviewing a determination of an administrative agency, a court may not choose from among alternate or inconsistent theories that the agency puts forth.  "It will not do for a court to be compelled to guess at the theory underlying an agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."  *SEC v. Chenery Corp.,* 332 U.S. 194, 196-97 (1947).

The lack of clarity compels the court to view the Final Results as resting on vague and inconsistent conclusions on the question of whether, and as to what period of time, Commerce found actual affiliation between Jinan Yipin and Houston Seafood.  This shortcoming in the Final Results is sufficient, standing alone, to require a remand to the Department for reconsideration and redetermination.

   2.  Commerce Has Not Made Findings of Fact Sufficient to Support a Conclusion of Affiliation
            Between Jinan Yipin and Houston Seafood During the Period of Review

Although the Department's inconsistent expressions of its conclusions are alone sufficient to preclude the court from sustaining the Final Results, the court discerns additional

shortcomings in the Department's analysis of the affiliation issue. Commerce did not make findings of fact that are sufficient to support a conclusion that affiliation, as defined in 19 U.S.C. § 1677(33), existed between Jinan Yipin and Houston Seafood during the entire period of review or during a specific segment of it. Commerce, in the Final Results and the Decision Memorandum, expresses few clear findings of fact relevant to the potential affiliation of Jinan Yipin and Houston Seafood and addresses inadequately record evidence to the contrary.

In the FA Memorandum, Commerce concluded that there was a "substantial likelihood of affiliation" between Jinan Yipin and Houston Seafood during the period of review. *FA Mem.* at 6. Commerce stated that "Houston Seafood and American Yipin could be considered affiliated for purposes of the Department's analysis" based on a finding of family affiliation, as defined in 19 U.S.C. § 1677(33)(A). *Decision Mem.* at 74-75. Commerce made a factual finding that an employee of American Yipin, Mr. Henry Lee, who served as the sales manager of American Yipin during some portion of the period of review, was in a position to control the prices that Jinan Yipin charged Houston Seafood at the same time that his brother, Mr. Edward Lee, held an ownership interest in Houston Seafood. *Id.* at 74; *FA Mem.* at 6. Commerce considered Edward Lee, as a result of his ownership interest in Houston Seafood, to have been in a position to influence or control the prices that Houston Seafood paid. According to Commerce, "[i]n terms of the statutory language, Edward Lee, as a co-owner, controlled Houston Seafood, and his 'affiliated' brother, as sales manager, controlled American Yipin's commercial decisions during part of the POR." *Decision Mem.* at 74. In support of an apparent conclusion that affiliation existed during some portion of the period of review, apparently the portion beginning on November 1, 2001 and ending on March 29, 2002, Commerce expressed in the Decision

Memorandum a finding that American Yipin and Houston Seafood "negotiated at least two transactions during this time . . . ." *Id.*

Commerce also found, and Jinan Yipin does not dispute, that Edward Lee began serving as sales manager for American Yipin at some point during the period of review. According to Commerce, Edward Lee had stated at verification that he became involved with American Yipin in August 2002 and that his involvement resulted in the relocation of American Yipin to Louisiana, where he resided. *FA Mem.* at 6. Jinan Yipin stated in its response to Commerce's first supplemental questionnaire that American Yipin moved its offices from Houston, Texas to Westwego, Louisiana in September 2002. *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y of Commerce* (June 10, 2003), Attach. at 8-9 (*Supplemental Questionnaire Resp. for Jinan Yipin Corp., Ltd.*) (Admin. R. Doc. No. 84) ("*First Supplemental Questionnaire Resp.*").

Disputing the Department's affiliation analysis, Jinan Yipin directs the court to its having filed on the administrative record a contract for the sale of Edward Lee's shares in Houston Seafood and proof of payment for this sale "indicat[ing] that Mr. Lee had sold his entire interest in Houston Seafood in March of 2002, approximately six months prior to the start of his employment with American Yipin." Jinan Yipin's Br. in Supp. 9. Jinan Yipin also points to a letter that Houston Seafood filed for the record "confirming that Edward Lee had not been involved with Houston Seafood since the sale of his ownership interest in March 2002." *Id.* at 10. The record contains evidence of a sale of Edward Lee's shares in Houston Seafood that occurred on March 29, 2002. *See FA Mem.* at 4. Although Commerce, in the FA Memorandum, raised vague questions about Edward Lee's credibility and the proof of the sale of the shares,

Commerce not only acknowledged the existence on the record of evidence that the divestiture of the shares occurred on that date but also identified a "purchaser of the Houston Seafood shares from Edward Lee during the period of review." *Id.* Commerce made no finding of fact to the contrary. The court concludes that Commerce found as a fact that the sale of Edward Lee's interest in Houston Seafood occurred during the period of review and that Commerce acknowledged record evidence that the sale occurred on March 29, 2002.

Although Commerce's apparent theory was that Henry Lee served as the sales manager of American Yipin during the portion of the period of review that began on November 1, 2001 and ended on March 29, 2002, the Decision Memorandum devotes insufficient attention to the question of whether substantial record evidence establishes the actual time period during which Henry Lee served as American Yipin's sales manager. Jinan Yipin argues that "American Yipin's payroll records demonstrate that Henry Lee began his employment with American Yipin in July 2002" and that "[t]he first American Yipin payroll record for Henry Lee appears on July 31, 2002." Jinan Yipin's Br. in Supp. 15-16 (citing *U.S. Sales Verification of Jinan Yipin Corp., Ltd., in the 2001/2002 Admin. Review of the Antidumping Duty Order of Fresh Garlic from the People's Republic of China* (Nov. 24, 2003), Ex. 6-A (Confidential Admin. R. Doc. No. 39) ("*Confidential Verification Report*")). The evidence Commerce considered to be to the contrary is a statement in Commerce's verification report: "Mr. Edward Lee, the sales manager of American Yipin, explained that his brother, Mr. Henry Lee, was the sales manager for the company when it was located in Texas." *U.S. Sales Verification of Jinan Yipin Corp., Ltd., in the 2001/2002 Admin. Review of the Antidumping Duty Order of Fresh Garlic from the People's Republic of China* 3 (Nov. 24, 2003) (Admin. R. Doc. No. 167) ("*Verification Report*"). This

paraphrase of Edward Lee's statement at verification is not inconsistent with the payroll evidence that Henry Lee began his employment at American Yipin in July 2002 (when, according to Jinan Yipin's questionnaire response, the company was still located in Houston, Texas). It does not constitute substantial evidence that Henry Lee was the sales manager of American Yipin on or prior to March 29, 2002.

Among the questions the court asked the parties following oral argument was the following: "What specific evidence establishes an affiliation between American Yipin and Houston Seafood for any portion of the period of review?" *Letter from Timothy C. Stanceu, Judge, to Counsel* 2 (May 22, 2006). Defendant responded that "at verification, Commerce learned for the first time that Edward Lee was American Yipin's sales manager and that Henry Lee, Edward Lee's brother, preceded Edward Lee as American Yipin's sales manager" and that "[a]t no time did Edward Lee, or any other American Yipin employee, allege that anyone else was sales manager of American Yipin during the period of review except for Henry Lee and Edward Lee." Def.'s Supplemental Br. 20. This argument is unpersuasive. Like the Decision Memorandum, defendant's argument fails to address the question of whether Edward Lee owned an interest in Houston Seafood at the same time that his brother was American Yipin's sales manager. Defendant's argument that no one at American Yipin alleged that there was another sales manager who served during the period of review is unconvincing in the absence of a factual finding, supported by record evidence, that Commerce ever asked a representative of American Yipin the question whether Henry Lee, or anyone else, served as sales manager of American Yipin between November 1, 2001 and March 29, 2002.

Defendant also responded that "Commerce's finding of affiliation between Houston Seafood and American Yipin is supported by other information in the record, as well[,]" mentioning that "Commerce found that Houston Seafood's customer list identified several of Edward Lee's other affiliated companies as customers, and Houston Seafood was even listed as a customer on the customer lists of some of the other affiliated companies." *Id.* at 21 (citing *FA Mem.* at 5). Citing the FA Memorandum, defendant argues that "[i]n fact, Commerce determined that the relationship between all of these entities was 'complex and fluid in terms of both time and control' and that 'Edward Lee at different points in time seems to have controlled, or shared control with others of, the pricing and sales functions of the various companies discussed above.'" *Id.* at 22 (*quoting FA Mem.* at 5). This argument misses the point. Evidence of affiliations of Edward Lee with customers of Houston Seafood are not evidence of an affiliation of Jinan Yipin, through American Yipin, with Houston Seafood.

Defendant also argued that "Commerce also found that American Yipin's payment terms with Houston Seafood were 'on average more advantageous than the terms offered to American Yipin's other customers.'" *Id.* The negotiation of the time period in which a buyer may pay a seller for merchandise may be the product of various factors other than affiliation. A finding that Houston Seafood was allowed more than the average time period to pay for merchandise is insufficient to support the legal conclusion of affiliation according to the criteria of 19 U.S.C. § 1677(33), under which "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33).

Citing a questionnaire response of Jinan Yipin stating that "'certain sales had post-invoice billing adjustments[,]'" defendant also argues that "Commerce explained this meant that for 'merchandise shipped in April and possibly even later' it was possible that prices were determined while Edward Lee owned Houston Seafood." Def.'s Supplemental Br. 23 (quoting *First Supplemental Questionnaire Resp.*). This argument rests on speculation, not on findings of fact that are supported by substantial evidence. Commerce appears to have assumed that the term "post-invoice billing adjustments" necessarily refers to renegotiations of sales contracts, an assumption that is not grounded in specific findings or evidence. Moreover, as discussed previously, the record lacks substantial evidence that Henry Lee began employment at American Yipin on or before March 29, 2002. Commerce has failed to support with substantial record evidence its apparent finding of fact that Edward Lee's ownership interest in Houston Seafood on and before March 29, 2002 had the potential to affect sales that Jinan Yipin or American Jipin made to Houston Seafood at any time during the period of review, regardless whether those sales were made before, on, or after March 29, 2002.

In its supplemental brief, defendant requests that the court remand this matter to Commerce "to allow further inquiry into Houston Seafood and its owner's relationships with Edward Lee and his affiliates during the period of review" and to allow Commerce "to inquire as to the terms of negotiations and sales of garlic from Jinan Yipin . . . ." Def.'s Supplemental Br. 24. Jinan Yipin, while seeking a remand for redetermination, opposes defendant's proposed voluntary remand and specifically opposes the reopening of the record for the collection of additional evidence on the affiliation issue, on the ground that the record contains

no ambiguity regarding Commerce's reasoning in its finding of affiliation between Jinan Yipin and Houston Seafood and its decision to apply facts otherwise available and adverse inferences. Jinan Yipin's Reply to Def.'s Supplemental Br. 9-10.

Because of the absence of essential findings of fact and the lack of substantial evidence supporting a finding that Henry Lee was the sales manager of American Yipin when Edward Lee held an ownership interest in Houston Seafood, the court views as unsatisfactory Commerce's analysis of affiliation, or possible affiliation, between American Yipin and Houston Seafood. As discussed later in this opinion, the court will issue a remand order that addresses the affiliation issue. That order allows a reopening of the record for a limited purpose with respect to the affiliation issue.

### 3.  The Final Results Cannot Be Sustained Upon Commerce's Findings that Jinan Yipin Withheld Information on the Affiliation Issue or Substantially Impeded Commerce's Access to Information Needed to Resolve that Issue

Subsection (a) of 19 U.S.C. § 1677e directs Commerce to use "facts otherwise available" when "necessary information is not available on the record" or when any of four conditions specified in subparagraph (a)(2) is met.  19 U.S.C. § 1677e(a).  Among the four conditions are the situations in which a party "withholds information that has been requested by the administering authority" or "significantly impedes a proceeding under this subtitle." *Id.* § 1677e(a)(2)(A), (C).  In the Final Results, Commerce reiterated the conclusion it had reached in the Preliminary Results with respect to § 1677e(a), *i.e.*, Commerce concluded that resort to facts otherwise available was warranted because Jinan Yipin "did not provide information critical to the calculation of an antidumping duty margin and impeded the conduct of the administrative review by not providing correct and thorough responses to [the Department's] questions, before,

during, and following verification." *Final Results*, 69 Fed. Reg. at 33,627.  The court concludes

that certain of the findings of fact on which Commerce based its resort to facts otherwise

available and adverse inferences were not supported by substantial record evidence.

Commerce stated in the Final Results that "the Department has applied adverse facts

available to the sales to Jinan Yipin's affiliated customer . . . because Jinan Yipin failed to

identify affiliated parties and, in particular, its affiliations to Houston Seafood and Bayou Dock

in its questionnaire responses." *Id.* at 33,628.  To the extent that this finding pertains to the sales

made to Houston Seafood, it cannot be sustained upon judicial review because it presumes that

Jinan Yipin and Houston Seafood are affiliated parties.  As discussed above, the Final Results

express vague and inconsistent conclusions on the issue of affiliation between Jinan Yipin and

Houston Seafood.  Moreover, defendant now seeks leave of the court to investigate that issue

further.  Defendant nevertheless advocates that the court sustain Commerce's use of facts

otherwise available based on Commerce's findings that Jinan Yipin withheld requested

information and significantly impeded the review.  The court is unable to do so because the

affiliation analysis in the Final Results invokes 19 U.S.C. § 1677e(a)(2)(A), the "withholds

information" provision, and 19 U.S.C. § 1677e(a)(2)(C), the "significantly impedes a

proceeding" provision, essentially on the premise that Jinan Yipin's responses to questions

withheld from Commerce the fact of Jinan Yipin's affiliation with Houston Seafood–an

affiliation that Commerce does not unambiguously find to have existed and for which the record

lacks substantial evidence.  *See* 19 U.S.C. § 1677e(a)(2)(A), (C).

In its supplemental brief, defendant attempts to justify the Department's conclusions that

Jinan Yipin withheld requested information, and significantly impeded the review, by discussing

various questions in section A of the Department's questionnaire and Jinan Yipin's responses. Def.'s Supplemental Br. 5-11. Defendant concludes that "[i]n summary, although there were multiple opportunities for Jinan Yipin to provide information about American Yipin and Edward Lee (and the affiliated customer, Houston Seafood) in response to the Section A questionnaire, Jinan Yipin repeatedly failed to provide this information." *Id.* at 10. This argument is unpersuasive because defendant fails to identify any specific requests for information in the original questionnaire that required Jinan Yipin to disclose Edward Lee's employment by American Yipin as sales manager or his ownership interest in Houston Seafood.

Defendant argues that Jinan Yipin should have interpreted certain questions about Jinan Yipin's corporate structure and management that were presented in Section A of the questionnaire as requests for information pertaining to American Yipin. *Id.* at 8-10. As an example, defendant directs the court to Commerce's asking Jinan Yipin, in Question A.2.1 of the original questionnaire, to "[p]lease identify the people who currently manage your company and explain how they were selected for these positions[,]" arguing that Edward Lee's role as sales manager of American Yipin should have been disclosed in the response. *Id.* at 8 (internal quotation marks omitted). The shortcoming in Commerce's argument is that the quoted question, in asking for information about "your company," cannot reasonably be construed as a request for information about another company with which Jinan Yipin is affiliated. Defendant argues that "anyone who has participated in previous administrative reviews would be aware that Commerce considers the management of affiliated companies just as essential to its antidumping analysis as the management of respondent's headquarters, and in some respects, such as calculating the constructed export price, even more essential." *Id.* at 9. The court does not agree

with defendant's argument. If, as defendant argues, it was essential and routine for Commerce to be provided with information about the identity of managers of separate but affiliated companies, then Commerce needed to request that specific information. Defendant maintains that "[a]s with any other question, if Jinan Yipin had believed the term 'company' was unclear in Question A.2.1., the proper procedure would have been to ask Commerce for clarification, rather than providing no response whatsoever." *Id.* The implication of defendant's argument is that Jinan Yipin should have interpreted the word "company" or the words "your company" according to something other than the ordinary and unambiguous meaning. The court is unable to conclude that Jinan Yipin was remiss in interpreting the word "company" to refer to Jinan Yipin or that Jinan Yipin should have sought "clarification" on Commerce's use of that term.

According to defendant's argument, Commerce, due to Jinan Yipin's failure to disclose requested information in Section A of the questionnaire, "(1) did not know Edward Lee was involved in this review, (2) did not know Houston Seafood existed under a different name on the customer list for Jinan Yipin, (3) did not know Edward Lee was affiliated with or owned Houston Seafood at ANY point in time, and (4) essentially knew nothing about American Yipin's activities during the period of review." *Id.* at 10-11. As to the first and third points, the court is unable to find in Section A any information request by Commerce that required disclosure of Edward Lee's involvement in the review or his ownership interest in Houston Seafood. Similarly, as to the second point, the fact that Houston Seafood was listed under a different name on Jinan Yipin's customer list does not support a conclusion that Jinan Yipin

withheld requested information.[8]  The fourth point in the quoted statement from defendant's

brief–that Commerce essentially knew nothing about American Yipin's activities during the

period of review–is not an accurate characterization of the record facts.  Jinan Yipin disclosed in

its Section A response the fact that American Yipin, located in Westwego, Louisiana, was its

sales affiliate in the United States.  *Letter from Grunfeld, Desiderio, Lebowitz, Silverman &*

*Klestadt, LLP to Sec'y of Commerce* (Feb. 21, 2003), Attach. 1 at 11 (*Section A Resp. of Jinan*

*Yipin Corp., Ltd.*) (Admin. R. Doc. No. 42).  As defendant acknowledges, Jinan Yipin also

informed Commerce in its Section A response that "its 'president and vice president,' as well as

the 'principals and sales manager of its U.S. affiliate, American Yipin' were 'authorized to

negotiate sales.'"  Def.'s Supplemental Br. 8.

Defendant argues that the Department's first supplemental questionnaire presented Jinan

Yipin "with another opportunity to explain American Yipin [*sic*] and Edward Lee's affiliations."

*Id.* at 11.  However, the essential question is not whether the first supplemental questionnaire was

such an opportunity.  The essential question is whether Jinan Yipin's responses withheld

information relevant to a conclusion of affiliation between Houston Seafood and Jinan Yipin

(either directly or through its affiliation with American Yipin) that Commerce actually requested.

The record evidence consisting of the actual questions and responses does not support

Commerce's finding that such information was withheld.  Defendant fails to show that any of the

questions in the first supplemental questionnaire specifically directed, or otherwise required,

---

[8] According to defendant's supplemental brief, "Houston Seafood underwent a name change during the period of review and respondents requested proprietary treatment for its new name.  Thus, this entity is referred to consistently herein as 'Houston Seafood.'"  Def.'s Supplemental Br. 6, n.1.

Jinan Yipin to provide the name of American Yipin's sales manager. Defendant points specifically to supplemental question A.2.a, which asked Jinan Yipin to "'identify any positions that your owners, directors and managers hold with other companies and/or entities[,]'" arguing that "[t]his was a perfect opportunity for Jinan Yipin to report Houston Seafood's relationship with Edward Lee, a sales manager during the period of review, yet Jinan Yipin chose not to provide this information, instead responding that 'none' of 'Jinan Yipin's owners, directors, or managers hold any positions with other companies.'" *Id.* at 11 (quoting *Supplemental Questionnaire* A.2.a); *see First Supplemental Questionnaire Resp.* 2. Jinan Yipin cannot logically be faulted for failing to provide information beyond the scope of the question that Commerce asked.

Following verification, Commerce sent a questionnaire ("third supplemental questionnaire") to Jinan Yipin. In the first question, after stating that Houston Seafood (and two other companies, Louisiana Newpack and Bayou Dock Seafood ("Bayou Dock")) appeared to have been affiliated with American Yipin and Jinan Yipin for at least part of the period of review, Commerce asked Jinan Yipin to respond to Section A of the original questionnaire "with regard to these companies" and to provide official copies of certain documents related to Houston Seafood, Louisiana Newpack, and Bayou Dock. *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to the Sec'y of Commerce* (Nov. 12, 2003), Attach. at 1 (*3rd Supplemental Questionnaire for Jinan Yipin Corp., Ltd.*) (Admin. R. Doc. No. 161). Jinan Yipin responded that the Department was incorrect and that "[r]ecord evidence in this review already demonstrates that there is no 'affiliation' within the established meaning of that term between American Yipin or Jinan Yipin and Hosuton [*sic*] Seafood Corp., Louisiana Newpack

and Bayou Dock." *Id.* Jinan Yipin provided materials related to Louisiana Newpack and Bayou

Dock with the response and indicated it would provide the Houston Seafood materials under

separate cover. *Id.* at 2, Ex. 1.

Commerce did not provide a satisfactory explanation of why Jinan Yipin, in its response

to the third supplemental questionnaire, should be considered to have withheld requested

information about a possible relationship between Houston Seafood and Jinan Yipin or American

Yipin. Also unexplained is why, if Commerce still was uncertain after verification as to the

existence of such a relationship, the third supplemental questionnaire made no attempt to obtain

additional information or clarification relevant to determining the date on which Henry Lee

began his employment with American Yipin.

In summary, the court is unable to find in the administrative record substantial evidence

to support a finding that Jinan Yipin withheld information relevant to the issue whether Jinan

Yipin was affiliated with Houston Seafood within the meaning of 19 U.S.C. § 1677(33) or

significantly impeded the review with respect to that issue. Therefore, the court is unable to

sustain Commerce's reliance on "facts otherwise available" under 19 U.S.C. § 1677e(a)(2)(A)

or (C).

4. On Remand, Commerce Must Redetermine the Weighted Average Percentage Antidumping Duty Margin for Jinan Yipin and May Not Treat the Sales of Subject Merchandise to Houston Seafood that Were Negotiated After March 29, 2002 as Affiliated Sales

Commerce expressed no findings of fact upon which the court could sustain a conclusion

that an affiliation between Jinan Yipin and Houston Seafood could have existed after March 29,

2002. Commerce's affiliation analysis depended on Edward Lee's and Henry Lee's family

relationship. As discussed previously, Commerce made a finding of fact, based on evidence on

the record, that Edward Lee sold his ownership interest in Houston Seafood during the period of

review, and Commerce acknowledged record evidence that the sale occurred on March 29, 2002.

Commerce made no findings of fact to the contrary. Commerce also found as a fact that at least

two sales to Houston Seafood were negotiated during that period. Commerce's assigning of the

376.67 percent antidumping duty rate to the remainder of the sales of Jinan Yipin's garlic to

Houston Seafood that occurred during the period of review was, therefore, contrary to

Commerce's own findings of fact and without a rational basis. Commerce's attempt to justify its

application of the 376.67 percent rate to sales after March 29, 2002 through resort to facts

otherwise available and adverse inferences fails when viewed in the context of the findings of

fact that Commerce made and did not make. Moreover, as discussed previously, Commerce's

findings of fact concerning an alleged withholding of information and impeding of the review are

unsupported by substantial record evidence. For all of these reasons, the court concludes that

Commerce, on remand, must recalculate Jinan Yipin's weighted average percentage antidumping

duty margin to correct the error that occurred when Commerce treated as affiliated party sales the

sales to Houston Seafood that were negotiated on and after March 29, 2002. As a consequence

of Commerce's own findings of fact and the errors discussed above, Commerce, on remand, may

not treat sales of Jinan Yipin's subject merchandise to Houston Seafood that were negotiated

after March 29, 2002 as affiliated sales.

        The assignment of the 376.67 percent rate to the two or more transactions that Commerce

found to have been negotiated during the period beginning November 1, 2001 and ending

March 29, 2002 is also contrary to law, but for different reasons. Commerce concluded that an

affiliation or possible affiliation existed between Jinan Yipin and Houston Seafood during that

period based on its apparent finding that Henry Lee began his employment with American Yipin prior to July 2002. As discussed previously, the record as a whole lacks substantial evidence to support any such finding. The evidence consisting of the July 31, 2002 payroll record is inconsistent with such a finding, and the paraphrase of the statement made by Edward Lee at verification is inconclusive on this point.

In determining that the assignment of the 376.67 percent rate to these two or more transactions was contrary to law, the court does not overlook certain record evidence that supports Commerce's finding that American Yipin's payroll records were not in all respects accurate. *See infra* Section B (addressing the issue of indirect selling expenses). For this reason, Commerce was justified in its reluctance to find, based on the July 31, 2002 payroll record, that Henry Lee began his employment with American Yipin no sooner than July 2002. The issue of when Henry Lee's employment began is critical to determining whether Commerce acted according to law in invoking its authority under 19 U.S.C. § 1677e in determining an antidumping margin for those two or more transactions. Accordingly, the court will allow Commerce, on remand, to reopen the record for the limited purpose of obtaining evidence to determine the start date of Henry Lee's employment, if it so chooses. Should Commerce conclude based on new record evidence that affiliation existed for sales to Houston Seafood negotiated on or before March 29, 2002, it also must justify as appropriate and not punitive the application of any rate that results from the use of facts otherwise available and adverse inferences. *See F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

Because Commerce found as a fact, based on record evidence, that Edward Lee sold his interest in Houston Seafood during the period of review and acknowledged record evidence that the sale occurred on March 29, 2002, and because critical findings of fact upon which Commerce invoked its authority under 19 U.S.C. § 1677e are unsupported by substantial evidence, the court in its discretion denies Commerce's request for a general reopening of the record so that Commerce may conduct additional fact finding on the affiliation issue.

### B.  In Using Facts Otherwise Available and Adverse Inferences to Recalculate Jinan Yipin's Indirect Selling Expense Factor, Commerce Relied on Findings that Are Not Supported by Substantial Record Evidence

Pursuant to 19 U.S.C. § 1677a(d)(1), Commerce must reduce the price used to establish constructed export price by the amount of any of various expenses incurred in selling the subject merchandise in the United States.  *See* 19 U.S.C. § 1677a(d)(1).  The expenses to be deducted include sales commissions, "expenses that result from, and bear a direct relationship, to the sale," selling expenses covered by the seller on behalf of the purchaser, and "any selling expenses" not covered by the other provisions.  *Id.* at §1677a(d)(1)(A)-(D).

In response to Commerce's questionnaire, Jinan Yipin calculated, as a percentage of American Yipin's total sales for 2002, an indirect selling expense factor ("ISE factor") for application to all of American Yipin's U.S. sales during the period of review, using the total indirect selling expenses that were set forth in American Yipin's 2002 profit and loss statement and that were not reported elsewhere.  *See* Jinan Yipin's Br. in Supp. 33; *see also FA Mem.* at 11. Invoking its authority to use facts otherwise available and adverse inferences, Commerce recalculated Jinan Yipin's reported ISE factor by adding to American Yipin's reported total indirect selling expenses all salary and benefits expenses that were incurred in 2002 by another

company, Bayou Dock, an importer and distributor of seafood products that was located near

American Yipin in Westwego, Louisiana. *See Decision Mem.* at 87-88. Commerce did so based

on its findings that Jinan Yipin withheld information and impeded the review by under-reporting

American Yipin's indirect selling expenses and by failing to disclose certain facts that Commerce

learned for the first time at verification, which established that American Yipin and Bayou Dock

shared employees and, according to Commerce, also shared salaries, computers, office space,

accounting software and records, overhead expenses, and other expenses. *Id.*

In the FA Memorandum, Commerce set forth its findings of fact that Edward Lee was the

owner and president of Bayou Dock, that two employees of American Yipin, Bonnie Dufrene

and Martha Bourge, also were employees of Bayou Dock, that Edward Lee and the other two

Bayou Dock employees were paid consistently by Bayou Dock, and that Jinan Yipin's reported

indirect selling expenses did not include salaries for American Yipin's first three months of

operation in Westwego, Louisiana and did not include any general office start-up expenses, such

as office supplies, equipment, and overhead. *FA Mem.* at 11-12. The FA Memorandum also

stated that American Yipin officials told Commerce officials at verification that Edward Lee

spends ninety percent of his time working for American Yipin, that his current activities for

Bayou Dock are minimal, and that "Ms. Dufrene spends 50 to 75 percent of her time working for

American Yipin, depending on the workload, and the rest of her time working for Bayou Dock."

*Id.* at 11. "They explained that Ms. Bourge is a temporary employee and works for either

company as needed." *Id.* The FA Memorandum also stated that in response to Commerce's

question at verification as to how selling activities were allocated between American Yipin and

Bayou Dock, "Edward Lee responded (with agreement by the two other employees, Ms. Dufrene

and Ms. Bourge) that there [was] never any overlap of the two companies and that they do not do work for one company while at the other company." *Id.* at 12. Citing the Verification Report, the FA Memorandum stated that at verification Edward Lee "explained that American Yipin is a completely separate entity from Bayou Dock and the selling activities and accounting records are kept separately." *Id.* Commerce observed at verification, however, that Ms. Bourge, when at Bayou Dock, had the option of opening accounting records for American Yipin on the main screen of the accounting software. *Decision Mem.* at 87 (quoting *FA Mem.* at 12). Commerce stated that "we have determined that, by sharing employees, salaries, computers, office space, accounting software and records, overhead expenses, and other expenses, American Yipin and Bayou Dock were managed and operated in a manner that is not consistent with two totally unaffiliated business entities during the period of review." *Id.* (quoting *FA Mem.* at 12).

Based on the findings discussed above, Commerce concluded that Jinan Yipin withheld information pertinent to the calculation of Jinan Yipin's antidumping duty margin when it failed to report as American Yipin's indirect selling expenses the expenses that were incurred by Bayou Dock and failed to act to the best of its ability in providing the necessary or accurate information on indirect selling expenses when it responded to the Department's questionnaires. *FA Mem.* at 12-13. Commerce invoked its authority under 19 U.S.C. § 1677e(a) and (b) in adding, as facts otherwise available and adverse inferences, all of Bayou Dock's salary and benefits expenses that were incurred in 2002 to American Yipin's reported total indirect selling expenses. *Id.*; *Decision Mem.* at 87-88.

Jinan Yipin argues that Commerce's calculation of its ISE factor is based on factual inaccuracies and is not supported by record evidence. Jinan Yipin's Br. in Supp. 36. Jinan Yipin

contests Commerce's finding that American Yipin did not incur any salary expense for office

staff for three months after opening, citing the Verification Report and exhibits for record

evidence that Henry Lee continued to receive salary from American Yipin during September-

December 2002 and that Ms. Dufrene and Ms. Bourge received payment from American Yipin in

December 2002 and a "sizable payment" in January 2003. *Id.* at 36-37 (citing *Confidential*

*Verification Report* Ex. 6-A). Concerning Commerce's finding that it could not locate a specific

expense of American Yipin for office supplies, Jinan Yipin identifies in American Yipin's

reported selling expenses "over $3,000 in a category called 'office/computer.'" Pls.' Reply to

Def.'s Opp'n to Pls.' Mot. for J. on the Agency Record 10, n.6 ("Jinan Yipin's Reply"). Jinan

Yipin also takes issue with Commerce's finding that at verification Edward Lee stated, with the

agreement by Ms. Dufrene and Ms. Bourge, that there was never any overlap of the two

companies and that the employees do not do work for one company while at the other company.

Jinan Yipin's Br. in Supp. 37. Jinan Yipin directs the court's attention to "affidavits placed on

the record by every American Yipin employee," stating that Edward Lee "did *not* make an

unequivocal statement that American Yipin employees never do work for American Yipin while

at Bayou Dock or vice versa." *Id.*

Commerce's determination of Jinan Yipin's ISE factor relies on a finding of fact that

Jinan Yipin and Bayou Dock "'shar[ed] employees, salaries, computers, office space, accounting

software and records, overhead expenses, and other expenses.'" *Decision Mem.* at 87 (quoting

*FA Mem.* at 12). Commerce referred to "findings that Bayou Dock incurred certain indirect

selling expenses on behalf of Jinan Yipin's sales of fresh garlic in the United States." *FA Mem.*

at 12. Commerce concluded that Jinan Yipin had failed to include these expenses as indirect

selling expenses in its questionnaire response. *Id.* at 12-13. The court concludes that substantial evidence supports a finding that some indirect selling expenses were under-reported or irregularly reported. However, certain of Commerce's specific findings on this general issue lack evidentiary support in the record.

The court discerns a lack of substantial record evidence for Commerce's finding that American Yipin did not pay any salaries for the first three months after relocating to Louisiana. This finding is inconsistent with the evidence of payments by American Yipin to Henry Lee during September-December 2002. *See* Jinan Yipin's Br. in Supp. 36 (citing *Confidential Verification Report* Ex. 6-A). Substantial record evidence does support, however, a finding, or at least a reasonable inference, that not all salary expenses of American Yipin's selling activities were included in Jinan Yipin's reported data. Jinan Yipin does not appear to contest the finding of fact that Edward Lee was paid no salary by American Yipin following American Yipin's move to Louisiana, and the record contains no other explanation as to how compensation for Edward Lee's activities on behalf of American Yipin was reflected in the business records and reported data. This lack of an explanation is all the more significant in light of Commerce's finding–also uncontested by Jinan Yipin–that Commerce officials were told at verification that Edward Lee spends ninety percent of his time working for American Yipin and that his activities for Bayou Dock are minimal. Although there is record evidence that Ms. Dufrene and Ms. Bourge received payments from American Yipin in December 2002 and substantial payments in January 2003, the apparently deferred payments raise additional, unanswered questions concerning possible irregularities in the reporting of their salary expenses. Jinan Yipin does not appear to dispute that

Ms. Dufrene and Ms. Bourge were not paid until December 2002 for work performed for American Yipin following the move of the office to Louisiana the previous September.

Commerce's general finding that American Yipin shared computers, office space, accounting software and records, overhead expenses, and other expenses appears to be overly broad given the specific findings and evidence cited by Commerce. The shared employees were Ms. Dufrene (who is listed in the Verification Report as American Yipin's "Import and Logistic Manager") and Ms. Bourge (listed therein as "Bookkeeper"). *See Verification Report* Attach. I. Concerning shared office space, these employees, according to evidence relied on by both Jinan Yipin and by defendant, sometimes performed functions for one company at the location of the other company. Commerce cites evidence that Ms. Bourge could access American Yipin's accounting software from a computer located at Bayou Dock, using common software. *Decision Mem.* at 87 (quoting *FA Mem.* at 12). Defendant has not directed the court to record evidence of any other shared "'overhead expenses, and other expenses.'" *See id.* (quoting *FA Mem.* at 12).

Based on the record evidence supporting a finding that Jinan Yipin did not properly report all of its indirect selling expenses, the court concludes that Commerce had a reasonable basis upon which to make an upward adjustment in Jinan Yipin's ISE factor by adding some expenses incurred by Bayou Dock and to do so by invoking the procedures of 19 U.S.C. § 1677e(a) and (b). Based on substantial record evidence, Commerce reasonably concluded that Jinan Yipin did not "act[] to the best of its ability" in reporting the required indirect selling expense information. 19 U.S.C. § 1677e(b). The court concludes, however, that the Final Results do not contain a satisfactory explanation of why it was reasonable and appropriate to add *all* the 2002 salary and benefits expenses of Bayou Dock, a distributor of seafood products, to

American Yipin's reported total indirect selling expenses for the sale of subject garlic, as an application of facts otherwise available and adverse inferences. The evidence as a whole pertaining to the scope of possible expenses incurred by Bayou Dock that properly should have been reported as expenses of American Yipin does not adequately support Commerce's broad finding that Jinan Yipin and Bayou Dock "'shar[ed] employees, salaries, computers, office space, accounting software and records, overhead expenses, and other expenses.'" *Decision Mem.* at 87 (quoting *FA Mem.* at 12). The errors in reporting indirect expenses did not pertain to the entire period of review but only to that portion affected by American Yipin's move to Louisiana in September 2002.

On remand, Commerce must reconsider its calculation of American Yipin's ISE factor based on all record evidence, including specifically the record evidence that refutes some of the findings of fact on which Commerce based that calculation. In selecting from among the facts otherwise available as an adverse inference, Commerce must adhere to its obligation to create the proper deterrent to non-cooperation without doing so in a way that is punitive. *See de Cecco*, 216 F.3d at 1032 (Fed. Cir. 2000).

C. Commerce Did Not Act Contrary to Law in Deducting the Full Amount of Inspection Fees when Calculating Jinan Yipin's Constructed Export Price

During the period of review, Jinan Yipin incurred certain charges as a result of the inspections of some of its garlic exports by United States Customs and Border Protection ("Customs"), the United States Department of Agriculture ("USDA"), and the United States Food and Drug Administration ("FDA"). *See Decision Mem.* at 89-90. Commerce determined that these inspection charges are within the scope of 19 U.S.C. § 1677a(d)(1)(D), which includes

"any selling expenses" not covered by the other provisions of the subsection, and deducted them as part of its calculation of the constructed export price for Jinan Yipin's garlic. *Id.* at 90.

According to Jinan Yipin, some of the inspection charges resulted directly from the antidumping duty order and, therefore, when deducted resulted in an artificially inflated dumping margin contrary to the intended purpose of 19 U.S.C. § 1677a(d)(1). Jinan Yipin's Br. in Supp. 60-61. Jinan Yipin argues that *Daewoo Electronics Co. v. United States*, 13 CIT 253, 270, 712 F. Supp. 931, 947 (1989), *rev'd on other grounds*, 6 F.3d 1511 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1204 (1994) and *Federal-Mogul Corp. v. United States*, 17 CIT 88, 107, 813 F. Supp. 856, 871-72 (1993), establish a policy against the deduction of expenses incurred as a direct result of an antidumping duty order. *Id.* at 60. During the review, Jinan Yipin submitted correspondence from its U.S. customs broker which alleged that, because garlic from China was the subject of an antidumping duty order, Jinan Yipin's containers were "picked more frequently for inspection." *Id.* at 59 (quoting *Confidential Verification Report* Ex. 9) (internal quotation marks omitted). Plaintiff also submitted follow-up correspondence in which the broker stated that Jinan Yipin's containers were "4 or 5 times more likely" to be examined than a nonagricultural product not subject to an antidumping order. *Id.* (quoting *Confidential Verification Report* Ex. 9) (internal quotation marks omitted).

Defendant argues that Commerce acted in accordance with law when it deducted the inspection charges. According to defendant, "Commerce has long determined that inspection charges are costs that are required to be deducted from constructed export price calculations pursuant to [19 U.S.C. §] 1677a(d)(1)(D)." Def.'s Mem. in Opp'n 46 (citing *Alhambra Foundry Co. v. United States*, 12 CIT 343, 354, 685 F. Supp. 1252, 1261 (1988) and *Southwest Fla.*

*Winter Vegetable Growers Assoc. v. United States*, 7 CIT 99, 105, 584 F. Supp. 10, 17-18

(1984)).  Defendant also points out that two of the agencies responsible for the inspection fees

are uninvolved in the enforcement of antidumping duty orders, and that the third, Customs, may

inspect the subject merchandise for a multitude of reasons unrelated to antidumping duty orders.

*Id*. at 46-47.

The USDA and FDA have broad authority to inspect imported agricultural products for

reasons that are unrelated to the collection or assessment of antidumping duties.  *See* 7 U.S.C.

§ 7731(b)(1) (2000) (authorizing the Secretary of Agriculture to "stop and inspect, without a

warrant, any person or means of conveyance" entering the U.S. to determine if the person or

means carries "any plant, plant product, biological control organism, plant pest, noxious weed, or

article subject to this chapter . . . ."); *see also* 21 U.S.C. § 381(a) (2000) (providing the Secretary

of Health and Human Services the power to test samples of imported food to determine whether

the food was "manufactured, processed, or packed under insanitary conditions . . . .").  Customs

is authorized by law to inspect imported merchandise for any number of reasons–or no reason at

all.  *See* 19 U.S.C. § 1581(a) (2000) (allowing Customs officials broad authority to "at any

time . . . examine, inspect, and search [any vessel or vehicle] and every part thereof and any

person, trunk, package, or cargo on board . . . .").

Jinan Yipin has failed to ground its challenge to Commerce's deduction of the inspection

charges on any record evidence that these charges, or any portion of them, were the direct result

of the antidumping duty order.  The customs broker's statements that are the basis of Jinan

Yipin's argument are entirely speculative.  *See* Jinan Yipin's Br. in Supp. 59.  They point to no

specific instance in which any agency made a decision to inspect Jinan Yipin's merchandise

because of the existence of the antidumping duty order and provide no factual basis for imputing

this rationale to the inspecting agencies. *See id.*

The court concludes that Commerce's deduction of the inspection charges in determining

constructed export price was not contrary to law. Based on the record evidence, Commerce was

justified in rejecting the claim that the inspection charges were the direct result of the

antidumping duty order and in concluding that the inspection fees were a selling expense that

was properly deducted in the calculation of constructed export price.

D.  The Department's Surrogate Valuations of Jinan Yipin's Garlic Seed, Water, and Cardboard
Cartons Were Based on Findings Unsupported by Substantial Record Evidence or Were
Otherwise Not in Accordance With Law

When merchandise is produced in a non-market economy ("NME") such as China,

Commerce presumes that factors of production are under state control and that home market

sales are not reliable indicators of normal value. *See* 19 U.S.C. §§ 1677(18)(A), (C), 1677b.

Accordingly, Commerce calculates normal value by isolating each factor of production in the

production process in the NME country and assigning to it a value from a surrogate market

economy country using the "best available information." *See id.* § 1677b(c)(1). The factors of

production include, but are not limited to, labor, raw materials, energy and other utilities, and

representative capital cost, including depreciation. *Id.* § 1677b(c)(3). In valuing the factors of

production, Commerce must use the "best available information regarding the values of such

factors in a market economy country or countries considered appropriate by [Commerce]." *Id.*

§ 1677b(c)(1). Although "best available information" is not defined in the antidumping statute,

the statute directs Commerce to use surrogate values that are "(A) at a level of economic

development comparable to that of the nonmarket economy country, and (B) significant

producers of comparable merchandise." *Id.* § 1677b(c)(4). Commerce adds to the total factors

of production an estimated amount for general expenses and profit, plus the cost of containers,

coverings, and other expenses. *Id.* § 1677b(c)(1).

### 1. Commerce Did Not Support with Substantial Record Evidence the Findings Underlying the Department's Surrogate Valuation of Jinan Yipin's Garlic Seed

In the administrative review at issue here, the eighth administrative review, Commerce

selected India as the surrogate market economy country. Garlic seed is one of the factors of

production that Commerce valued.[9] Commerce valued Jinan Yipin's garlic seed at 50 Indian

rupees ($1.03) per kilogram, which is the price set forth in several "News Letters" of the National

Horticultural Research and Development Foundation ("NHRDF") for Indian varieties of garlic

seed that were developed by NHRDF and sold by NHRDF in India. *Factors Valuations for the

Preliminary Results of the Admin. Review and New Shipper Reviews* 2-3. (Dec. 1, 2003) (Admin.

R. Doc. No. 170) ("*Factors Valuations Mem.*"). Commerce used this 50 rupees-per-kilogram

value at the urging of the petitioners in the antidumping duty investigation, who submitted for the

record the NHRDF News Letters, all of which listed a 50 rupees-per-kilogram price for the two

varieties. *See id.*; *Decision Mem.* at 5, 10. The News Letters placed on the record pertain to the

period between July 2001 and December 2002. *Factors Valuations Mem.* at 2. In conducting the

new shipper review of Jinan Yipin, Commerce had relied on the NHRDF price for two Indian

varieties of garlic seed, "Agrifound Parvati" and "Yamuna Safed," in valuing Jinan Yipin's garlic

seed. *Jinan Yipin New Shipper Review*, 67 Fed. Reg. at 72,140. In the Preliminary Results,

Commerce based its use of the 50 rupees-per-kilogram value on the NHRDF seed price for

---

[9] According to the record evidence, garlic seed consists of cloves of garlic, which after planting grow into new bulbs.

Agrifound Parvati, Yamuna Safed-3, and three other NHRDF garlic varieties, Yamuna Safed,

Yamuna Safed-2, and Agrifound White. *Preliminary Results*, 68 Fed. Reg. 68,873; *Decision*

*Mem.* at 10. In the Decision Memorandum, Commerce revised its determination, explaining that

"[u]pon closer review of the bulb diameter and number of cloves per bulb of each variety, we

find that only the Agrifound Parvati and the Yamuna Safed-3 varieties match the subject

merchandise closely in these key characteristics." *Decision Mem.* at 10. Commerce, however,

also noted that "[t]his narrowing of the selection does not change the amount of the value for the

final results because the prices for all of the varieties we used in the preliminary results were

identical." *Id.*

Jinan Yipin argued during the administrative review that the Department's valuation of

Jinan Yipin's garlic seed at 50 rupees per kilogram was aberrational relative to all other sources

of Indian garlic prices on the record of the review. Jinan Yipin's Br. in Supp. 40 (citing *Letter*

*from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y of Commerce* (Mar. 23,

2004), Attach. at 28-37 (Admin. R. Doc. No. 223) ("*Jinan Yipin's Case Br.*")). The price

Commerce selected, according to Jinan Yipin, is more than 65 percent higher than the highest

average price in India for domestic wholesale grade A garlic. *Id.* at 44 (citing *Jinan Yipin's Case*

*Br.* at 33). Jinan Yipin further argued during the administrative review that Commerce should

have valued garlic seed according to values for imported garlic obtained from Indian import data,

as it had done in the seventh administrative review, the administrative review that immediately

preceded the one at issue. *Decision Mem.* at 3; *see* Jinan Yipin's Br. in Supp. 45. Based on the

Indian import statistics, Jinan Yipin advocated during the administrative review a surrogate value

of 16.22 rupees per kilogram for garlic seed. *Letter from Grunfeld, Desiderio, Lebowitz,*

*Silverman & Klestadt, LLP to Sec'y of Commerce* (June 30, 2003), Attach. at 3-4 (Admin. R.

Doc. No. 101) ("*Jinan Yipin's Surrogate Value Submission*").

Before the court, Jinan Yipin contends that because NHRDF is a government-sponsored

research center, not a seller or exporter of garlic, the NHRDF price is neither a market price nor a

country-wide price in India.  Jinan Yipin's Br. in Supp. 43-44.  It also argues that the NHRDF

price is not representative of Jinan Yipin's garlic seed because Jinan Yipin produces purple garlic

and not white garlic such as that represented by the NHRDF varieties, which, although not

genetically modified, are scientifically-developed "clonal/hybrid" varieties.  *Id.* at 42.  Jinan

Yipin argues that Commerce should have rejected the NHRDF data and valued garlic seed using

the Indian import statistics or, in the alternative, using other domestic Indian prices for garlic that

are on the record in the proceeding, including prices contained in the June 2003 market research

report placed on the record by petitioners, *Market Research on Fresh Whole Garlic in India*.  *Id.*

at 46; *Letter from Collier Shannon Scott, PLLC to Sec'y of Commerce* (June 30, 2003)

("*Petitioner's Surrogate Value Submission*"), Ex. 7 ("*Market Research on Fresh Whole Garlic in*

*India*") (located in App. to Pls.' Br. in Supp. of Their Rule 56.2 Mot., Public Version, Ex. 12).

Defendant argues that the court should sustain Commerce in the use of the NHRDF data

to determine surrogate value because Commerce found, according to record evidence, that those

data are the most product-specific information on the record with which to value Jinan Yipin's

garlic seed.  Def.'s Mem. in Opp'n 31-34.  Defendant's principal argument is that Commerce

selected the two NHRDF varieties because they match two characteristics of Jinan Yipin's

garlic–average bulb diameter and number of cloves per bulb–that affect significantly the price of

garlic in the marketplace.  *See id.*

The court concludes that Commerce did not support with substantial record evidence certain findings of fact, set forth in the Decision Memorandum, upon which Commerce relied in valuing Jinan Yipin's garlic seed according to the NHRDF prices instead of other record information. For its findings on bulb size and number of cloves per bulb for Agrifound Parvati and Yamuna Safed-3, Commerce relied on the aforementioned market research report, *Market Research on Fresh Whole Garlic in India*, that petitioners submitted for the record of the review. *See Decision Mem.* at 8-11. Commerce, however, made no mention of certain factual information that is inconsistent with its findings. That factual information concerns the characteristics of Indian garlic imports and is set forth in the very market research report upon which Commerce relies. *See id.* Although the market research report contains record evidence supporting a finding that Agrifound Parvati and Yamuna Safed-3 are comparable to the subject merchandise with respect to bulb diameter and the number of cloves per bulb, the same publication refutes findings essential to the Department's choice to use the NHRDF data over the import data.

In discussing its reasons for choosing the NHRDF prices over the import data, Commerce made the following findings of fact in the Decision Memorandum:

> The pricing information of the two selected varieties represent the most product-specific information on the record. The alternative information, Indian import data, is considerably less product-specific because we cannot ascertain the quality or nature (*i.e.*, bulbs, loose cloves, etc.) of the garlic products entered under the applicable [Harmonized Tariff Schedule] category. In the *Seventh Administrative Review*, we selected the import data over the NHRDF pricing data submitted by the petitioners. In this review, however, they submitted detailed information about the seed varieties that enabled us to draw significant similarities between certain pricing information from NHRDF and and [*sic*] the subject merchandise.

*Id.* at 11. Commerce found that the garlic produced by Jinan Yipin and Shandong "had a diameter in excess of five centimeters" and that "[a]t the verification of Jinan Yipin's factors-of-production data, . . . the average number of cloves per bulb [was] fourteen." *Id.* at 10. Commerce relied on information in the market research report for its conclusion that the Agrifound Parvati and the Yamuna Safed-3 varieties "match the subject merchandise closely in these key characteristics." *Id.* Exhibit 4.2 of that report lists Agrifound Parvati as having a diameter of 50 to 65 millimeters and 10 to 16 cloves per bulb. *Market Research on Fresh Whole Garlic in India* at 14. Yamuna Safed-3 is shown therein as having a diameter of 50 to 60 millimeters (average 58.7 millimeters) and 15 to 18 cloves per bulb. *Id.*

The finding regarding product specificity is unsustainable on this record; specifically, given the record evidence, the court cannot affirm the Department's finding that "[t]he alternative information, Indian import data, is considerably less product-specific because [Commerce] cannot ascertain the quality or nature (*i.e.*, bulbs, loose cloves, etc.) of the garlic products entered under the applicable [Harmonized Tariff Schedule] category." *Decision Mem.* at 11. As discussed in detail below, the publication presents factual evidence–which Commerce did not reference or discuss in the Decision Memorandum–that Chinese garlic imports constitute the overwhelming majority of all garlic imported in India, that Chinese garlic is imported in the form of whole bulbs, not loose cloves, and that these imports are comparable to the subject merchandise with respect to bulb diameter and number of cloves per bulb.

Discussing Indian imports of Chinese garlic, the market research report states that "Chinese garlic is *imported in whole bulb form* and is large bulbed with a diameter greater than 40 mm (mostly in the range of 50-65 mm)." *Market Research on Fresh Whole Garlic in India*

at 3.  Discussing typical characteristics of Chinese garlic imported into the Indian market, the report describes a cloves-to-bulb ratio of 10-15.  *Id.* at 29.  The report states that "most of the garlic imported into India is from China," that "China and Hong Kong SAR now account for over 95% of garlic imports into India," and that imports from Hong Kong are believed to be essentially of Chinese origin.  *Id.* at 26-27.  For the period April 1, 2001 to March 31, 2002, which overlaps the first five months of the period of review, the data in the report indicate an import share for China and Hong Kong of 95.3 percent of total imports by volume.[10]  *Id.* at 26-29.  For the partial period of April 1, 2002 to December 31, 2002, which overlaps the remaining seven months of the period of review, the data show an import percentage of percentage of 96.2 percent by volume for China and Hong Kong.[11]  *Id.*  For the former period, the report lists an average import value of 20.36 rupees per kilogram; for the latter, the average import value is 15.30 rupees per kilogram.  *Id.* at 27.

Stating that the only other exporting country of significance is Malaysia, the report speculates that a significant part of the Malaysian imports are of Chinese origin based on the close similarity in import values and the lack of a traditional garlic exporting industry in Malaysia.  *Id.*  Data in the report show that neither Hong Kong's nor Malaysia's garlic exports to

---

[10] For the period April 1, 2001 to March 31, 2002, the tables indicate that of a total import quantity of 36,186.94 metric tons, 34,199.5 metric tons are from China and 289 metric tons are from Hong Kong.  *Market Research on Fresh Whole Garlic in India* at 26-29.  Hence, the tables indicate that 95.3 percent of imports are from China and Hong Kong.

[11] For the period April 1, 2002 to December 31, 2002, the tables indicate that of a total import quantity of 28,264.5 metric tons, 26,671.5 metric tons are from China and 512 metric tons are from Hong Kong.  *Id.*  Hence, the tables indicate that 96.2 percent of imports are from China and Hong Kong.

India were at significant levels.[12]  *Id.* at 26-29 (showing that imports from Hong Kong were 0.8

percent and 1.8 percent of total imports by volume in the two periods, respectively, and that

imports from Malaysia were 2.4 percent and 2.0 percent by volume, respectively).  Even if

imports from Hong Kong and Malaysia were disregarded, prices in the import data would be

determined almost exclusively by the Chinese garlic imports.

The market research report also includes information on the quality of Chinese garlic

imports.  Commerce, while specifically stating that it was not making its valuation choice based

on production yields of different varieties of garlic, further justified its choice of NHRDF garlic

over the import data by reasoning that Commerce could not "ascertain the quality" of the

imported garlic represented by the import data.  *Decision Mem.* at 11.  This observation is not

consistent with the discussion of Chinese garlic imports in the market research report.  The report

found Chinese garlic imports to be of high production-yielding varieties and to have large bulbs,

due principally to cultivation in the long-day zone north of 30 degrees North latitude.  *Market*

*Research on Fresh Whole Garlic in India* at 3-4.  In sum, the market research report informs that

Indian imports consist almost entirely of Chinese garlic and that such Chinese garlic imports are

high production-yielding, large-bulb varieties.  The report specifically states that Agrifound

Parvati "is very similar to the Chinese garlic sold in India" and specifically is similar with respect

to bulb size and number of cloves per bulb.  *Id.* at 4.  Hence, Commerce's assumption that the

_____

[12] For the period April 1, 2001 to March 31, 2002, the tables indicate that of a total import quantity of 36,186.94 metric tons, 289 metric tons are from Hong Kong and 881 metric tons are from Malaysia.  *Id.*  Hence, the tables indicate that 0.8 percent of imports are from Hong Kong and 2.4 percent are from Malaysia.  For the period April 1, 2002 to December 31, 2002, the tables indicate that of a total import quantity of 28,264.5 metric tons, 5.12 metric tons are from Hong Kong and 562 metric tons are from Malaysia.  *Id.*  Hence, the tables indicate that 1.8 percent of imports are from Hong Kong and 2.0 percent are from Malaysia.

garlic represented by the import data differs significantly from the subject merchandise is contradicted by the record evidence considered as a whole.

Due to the failure to analyze the record data on Indian imports of Chinese garlic, the Department's choice of the NHRDF data over the import data does not rest on findings supported by substantial record evidence and is not supported by adequate reasoning. The consequence of these shortcomings is the more serious due to the huge discrepancy between the value Commerce selected, 50 rupees per kilogram, and the prices for the garlic imports indicated in the report, which, as discussed previously, are roughly in the range of 15 to 20 rupees per kilogram. The Department's analysis cannot convince a reasonable mind, based on the record evidence before Commerce, that a producer in India of garlic of a variety comparable to that produced by Jinan Yipin or Shandong reasonably would be expected to incur a cost of 50 rupees per kilogram for the garlic seed that it routinely uses to produce its crop. The court, therefore, is unable to reach the conclusion that Commerce based its valuation of garlic seed on the "best available information." *See* 19 U.S.C. § 1677b(c)(1). Accordingly, on remand, the court will direct Commerce to reconsider and redetermine its valuation of garlic seed as a factor of production and to base its analysis of this issue on findings of fact that are supported by substantial record evidence. The court will allow Commerce to reopen the record if necessary for this purpose.

2. The Department's Surrogate Value for Jinan Yipin's Use of Water Is Unreasonable and Unsupported by Findings of Fact for Which There Is Record Evidence

In its calculation of the normal value of the subject merchandise, Commerce included as a factor of production a surrogate value for the irrigation water that Jinan Yipin used in its garlic cultivation. Commerce determined a value for water in the Preliminary Results, stating that

"[w]e valued water using the averages of municipal water rates from Asian Development Bank's *Second Water Utilities Data Book: Asian and Pacific Region* (October 1997)." *Preliminary Results*, 68 Fed. Reg. at 68,873. Commerce limited its discussion of the water issue to the Preliminary Results. The Final Results contain no discussion of the issue. Instead, the Final Results reference discussion of the "Valuation of Water" in the Decision Memorandum, which was appended to the Final Results. *Final Results*, 69 Fed. Reg. at 33,627, 33,630. Commerce sets forth its position in a brief, four-paragraph discussion in the Decision Memorandum. *Decision Mem.* at 14-16. The Department's discussion does not indicate any change from the valuation method specified in the Preliminary Results. *See id.*

Jinan Yipin argues that Commerce should not include water as a separate factor of production because doing so would not reflect the company's actual farming experience, citing record evidence that Jinan Yipin obtained its water for free and incurred only the utility cost of pumping the water from a local river. Jinan Yipin's Br. in Supp. 46-50. Jinan Yipin further objects that the Department's valuation of water as a separate factor of production resulted in double counting of the costs for water. *Id.* Jinan Yipin contends that the costs for water should be considered to be included in the surrogate value for factory overhead, or for selling, general and administrative expenses ("SG&A") that Commerce obtained from financial statement data of an Indian tea producer, Parry Agro Industries, Inc. ("Parry Agro"). *Id.*

Defendant maintains that because water indisputably is a raw input and thereby a factor of Jinan Yipin's garlic production, Commerce was required by 19 U.S.C. § 1677b(c) to select a surrogate value for Jinan Yipin's water use. *See* Def.'s Mem. in Opp'n 35-36. As support for the conclusion by Commerce that no double counting of the value of water occurred in the

administrative review, defendant argues that Parry Agro's overhead expenses did not include a line item for water and that there is no record evidence that irrigation water is essential to tea production in India.  *Id.* at 36.

Congress provided in 19 U.S.C. § 1677b(c)(3) that "the factors of production utilized in producing merchandise include, but are not limited to– . . . quantities of raw materials employed . . . [and] amounts of energy and other utilities consumed . . . ."  19 U.S.C. § 1677b(c)(3).  As indicated by the statutory language "include, but are not limited to," the reference to raw materials as well as utilities, and the reference to general expenses, Commerce has considerable discretion in deciding how it will treat a particular production input or cost when identifying factors of production.  *See id.*  Moreover, the Court of Appeals for the Federal Circuit has commented that Commerce has wide discretion with respect to surrogate value determinations under 19 U.S.C. § 1677b.  *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors in the application of those guidelines.").  That is not to suggest, however, that the court may sustain a surrogate value determination that lacks a reasonable explanation for the choice that Commerce made or that rests on findings of fact that are unsupported by substantial evidence on the record.

From the discussion in the Decision Memorandum, it appears that Commerce considered the irrigation water to be a raw material rather than a utility.  *See Decision Mem.* at 15 (explaining that "regardless of whether respondents purchased or collected water, the Department still uses the quantity of *raw materials* employed in its calculation of constructed value." (emphasis added)).  Commerce apparently based its decision to treat irrigation water as a direct

factor of production on its finding of fact that "irrigation of the [garlic] crops requires large quantities of water, and this is clearly different from water used by a company for incidental purposes." *Id.* In doing so, the Department departed from its factors-of-production analysis in the Jinan Yipin New Shipper Review, in which it stated as follows: "We treated water as a variable overhead expense rather than a direct material." *Jinan Yipin New Shipper Review*, 67 Fed. Reg. at 72,140.

The court does not agree with defendant's argument that Commerce was required by 19 U.S.C. § 1677b(c) to treat Jinan Yipin's irrigation water as a "raw material" to the exclusion of any other method of valuing the input. Defendant's statutory construction argument is inconsistent with the breadth of discretion indicated by the plain meaning of the provision. Irrigation water used in growing crops is not necessarily construed as falling within all common meanings of the term "raw material" as used in § 1677b(c)(3)(B); moreover, Commerce's discretion stems from its administering a statute that expressly allows for treatment of an input as a component of "general expenses" rather than as a raw material cost. The court views § 1677b(c) as affording Commerce the discretion to include water in its valuation of overhead or to value the energy cost of producing water instead of valuing water as a raw material where doing so would produce a more accurate determination of normal value under § 1677b(c) and, therefore, a more accurate antidumping duty margin. *See Parkdale Int'l v. United States*, 475F.3d 1375, 1380 (Fed. Cir. 2007) (stating that "an overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible . . . ."), *petition for cert. filed*, 76 U.S.W. 3046 (Jul. 16, 2007) (No. 07-65); *see also Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994) (stating that

"there is much in the statute that supports the notion that it is Commerce's duty to determine margins as accurately as possible . . . .").

Commerce's reasons for valuing water separately, as stated in the Decision Memorandum, do not include a statement of the conclusion of law that defendant is advocating before the Court. *See Decision Mem.* at 14-16. As such, defendant's legal argument is a *post hoc* rationalization, not a reason that Commerce stated for its choice of method. The court must evaluate Commerce's decision on surrogate valuation of water based on the reasons Commerce put forth. *See NEC Home Electronics, Ltd. v. United States*, 54 F.3d 736, 743 (Fed. Cir. 1995) (stating that the court is "powerless to affirm an administrative action on a ground not relied upon by the agency." (citation omitted)); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (holding that "courts may not accept . . . *post hoc* rationalizations for agency action . . . ."). The only presentation of those reasons is in the four-paragraph discussion in the Decision Memorandum. *Decision Mem.* at 14-16. That discussion, however, is inadequate to support the choice that Commerce made. Missing from the discussion are essential findings of fact and reasoning adequate to explain why Commerce chose its particular method over available alternatives.

Most of the discussion in the Decision Memorandum is directed to Commerce's attempt to refute arguments made by Jinan Yipin during the administrative review, in particular Jinan Yipin's reliance on certain decisions of the Court of International Trade. The only sentence in the first two paragraphs of the discussion of the water issue in the Decision Memorandum that explains Commerce's choice is a sentence in the second paragraph: "Moreover, water is a direct factor of production of garlic because irrigation of the crops requires large quantities of water,

and this is clearly different from water used by a company for incidental purposes." *Id.* at 15. The remainder of the first two paragraphs is directed to refuting Jinan Yipin's "double-counting" argument, citing the decision of the Court of International Trade in *Pacific Giant, Inc. v. United States*, 26 CIT 894, 223 F. Supp. 2d 1336 (2002) for the proposition that Commerce, under 19 U.S.C. § 1677b(c), constructs factors of production based on quantities of inputs, not the costs associated with those inputs. *See id.* at 14-15. The third paragraph distinguishes the holding in *Pacific Giant* from *Rhodia, Inc. v. United States*, 25 CIT 1278, 185 F. Supp. 2d 1343 (2001), on which plaintiffs relied in arguing before Commerce that Commerce should not value water because Jinan Yipin would not have incurred a cost for water if operating in a market economy. *See id.* at 12, 15. The fourth paragraph is devoted generally to a discussion of *Fuyao Glass Industry Group Co. v. United States*, 27 CIT 1892 (2003), a decision on which Jinan Yipin relied in the administrative review for its double-counting argument. *See id.* at 15-16. The fourth paragraph includes two points intended as a refutation of Jinan Yipin's double counting argument. *See id.* at 15. The first point is that the financial statements of Parry Agro do not indicate that Parry Agro, the tea producer Commerce chose as a surrogate for SG&A, incurred a cost for water; the second point is the lack of record evidence that tea production in India requires irrigation water. *See id.*

The discussion of the water issue in the Decision Memorandum does not include a satisfactory explanation of why Commerce believed, as it apparently did, that a more accurate determination of normal value would result from a decision to value water as a raw material rather than to treat water as a variable overhead expense, as it had in the *Jinan Yipin New Shipper Review*, or to value the energy cost that Jinan Yipin incurred to pump water out of a local river.

Commerce's resolution of the irrigation water issue is also unsatisfactory in two other respects. First, in relation to the "double counting" issue, Commerce presumed, without making actual findings of fact, that Parry Agro's financial statement did not include water in SG&A and that cultivation of tea in India does not require irrigation, and there appears to be no record evidence upon which such findings of fact could have been based. Absent such findings and evidentiary support on the record, the conclusion by Commerce that double counting did not occur is unsustainable. Second, the decision by Commerce to value water according to averages of municipal water rates is given no explanation in the Decision Memorandum and appears to rest upon an assumption, and not upon a finding of fact, that producers of garlic in India typically irrigate their garlic crops using water supplied by municipal utilities, at costs associated with such utilities. The Decision Memorandum does not cite record evidence that could support such a finding.

In summary, the method by which Commerce addressed the question of irrigation water lacks essential findings of fact and relies instead on mere assumptions, which find no apparent support in record evidence. The analysis does not include a rational explanation for the choice that Commerce made.[13] On remand, Commerce must reconsider its surrogate value analysis for

---

[13] The Department's citation in the Decision Memorandum to the decision of the Court of International Trade in *Pacific Giant*, on which defendant also relies in its brief opposing plaintiffs' motion for judgment upon the agency record, does not remedy the deficiencies in Commerce's analysis in this case. *See* Def.'s Mem. in Opp'n 37-38. *Pacific Giant*, which involved an administrative review of an antidumping duty order on freshwater crawfish tail meat from China, considered an issue of the cost of water used in crawfish tail meat production facilities. *See Pacific Giant, Inc. v. United States*, 26 CIT 894, 895, 904-05, 223 F. Supp. 2d 1336, 1338, 1346 (2002). The holding in the case cannot justify a result where, as here, Commerce based its factor-of-production analysis upon unsupported assumptions rather than essential findings of fact and failed to provide a rational explanation for its choice.

water use and redetermine this factor based on findings of fact that are supported by substantial

record evidence.  Commerce must present its reasons for selecting from among the possible

methods of valuing this factor, *e.g.*, valuation of the raw material or of the required energy

consumption, explaining why the method it chooses results in the most accurate antidumping

margin.  Commerce may reopen the record, if necessary, to obtain additional information.

  3.  Commerce Did Not Demonstrate that Its Valuation of Jinan Yipin's Cardboard Packing
     Cartons Was Based on the Best Available Information on the Record

   In determining the normal value of Jinan Yipin's merchandise, Commerce used a

surrogate value of 124.91 rupees per kilogram for the cardboard cartons in which Jinan Yipin

packed its garlic.  Commerce stated in the Preliminary Results that it calculated this value "using

import data from the *World Trade Atlas* that covered the period of review."  *Preliminary*

*Results*, 68 Fed. Reg. at 68,873.  The Preliminary Results directed the reader to an internal

memorandum for "a detailed description of all the surrogate values used."  *Id*.  That

memorandum (the "Factors Valuations Memorandum") relied on Indian import data under

subheading 4819.1001 of the Indian tariff schedule, which bears the article description "Boxes of

Corrugated Paper & Paper Board," in determining the 124.91 rupees-per-kilogram value.

*Factors Valuations Mem.* at 12, Attach. 13.  The Final Results do not address the carton

valuation issue except by reference to the incorporated Decision Memorandum, *Final Results*,

69 Fed. Reg. at 33,627, which adopts the determination made in the Preliminary Results, *i.e.*,

valuation of the cartons at 124.91 rupees per kilogram.  *Decision Mem*. at 18-20.

   Jinan Yipin argues that Commerce's carton valuation based on the Indian import statistics

is distorted because Indian tariff subheading 4819.1001 includes various types of specialty

cartons dissimilar to packing boxes plaintiff used and because the listed values include, for some cartons, air freight charges to which Jinan Yipin's boxes were not subject. Jinan Yipin's Br. in Supp. 51-54. Jinan Yipin advocates a value of 32.38 rupees per box, which it calculated as an average of price quotes that it obtained from four Indian vendors of cardboard cartons and that it submitted for the record during the review.[14] *See id*. at 54-58; *see also Jinan Yipin's Surrogate Value Submission* Ex. 14 at 1. Jinan Yipin argues that because the quotes pertain to boxes of the type actually used by Jinan Yipin, its proposed surrogate value is based on data more specific than the import data. Jinan Yipin's Br. in Supp. 55-57. Jinan Yipin further contends that the surrogate value based on import data "is more than 350% higher than the average price of domestic packing boxes." *Id.* at 57. Defendant counters that the Indian import data is the best available information because it is sufficiently specific to the input being valued and superior to the Indian price quotes in its contemporaneity with the period of review, its representation of a range of prices, and its public availability. Def.'s Mem. in Opp'n 39-44.

The court does not sustain Commerce's choice of surrogate value for Jinan Yipin's cartons. Commerce has not shown that it based its 124.91 rupees-per-kilogram value on the "best available information" as required by 19 U.S.C. § 1677b(c)(1). The Indian import data presented in the *World Trade Atlas*, although contemporaneous with the period of review, do not bear a reasonable relationship to the boxes used by Jinan Yipin to pack its garlic.

---

[14] Although average price is correctly calculated at 32.38 rupees per *box* in the exhibit to the plaintiff's surrogate value submission, the text of the submission incorrectly states that the average price is 32.38 rupees per *kilogram*. *See Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y of Commerce* (June 30, 2003), Attach. at 8, Ex. 14 at 1 (Admin. R. Doc. No. 101) ("*Jinan Yipin's Surrogate Value Submission*"). Plaintiff impliedly acknowledges this error in its brief supporting judgment on the agency record. *See* Jinan Yipin's Br. in Supp. 57 n.11.

Jinan Yipin used three types of paper cartons for packing. *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to the Sec'y of Commerce* (Mar. 4, 2003), Ex. D-8 at 1 (Admin. R. Doc. No. 43). About 90 percent of the boxes it used were of a single type, and the three types of boxes it used did not differ significantly from each other in either weight or capacity.[15] *Id*. The single-page excerpt from the *World Trade Atlas* on which Commerce relied for its valuation of Jinan Yipin's boxes reveals that the average value of boxes of corrugated paper or paperboard imported into India from individual countries varied widely, as follows: China, 38.74 rupees per kilogram; United Kingdom, 74.41 rupees per kilogram; Austria, 112.49 rupees per kilogram; Phillippines, 157.43 rupees per kilogram; and Spain, 239.05 rupees per kilogram.[16] Commerce did not explain why it used the import data despite this variation. Without further information, it would be illogical to assume that the country of origin, rather than substantial variations in the types of boxes imported, produced the wide variation in listed values. An average per-kilogram value obtained from all data on the page, therefore, would not appear to be a reasonable approximation of the value of Jinan Yipin's boxes.

Further, the court observes that data from six source countries–China, Thailand, Indonesia, South Korea, North Korea, and Finland–and the data in an "[u]nspecified" category,

---

[15] Jinan Yipin reported that it used three types of boxes: paper cartons weighing 750 grams with the capacity to hold 9.6 kilograms; paper cartons weighing 800 grams with the capacity to hold 10 kilograms; and paper cartons weighing 900 grams with the capacity to hold 30 pounds (13.6 kilograms). *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to the Sec'y of Commerce* (Mar. 4, 2003), Ex. D-8 at 1 (Admin. R. Doc. No. 43) ("*Section D Resp.*"). For each cubic ton of garlic packed, Jinan Yipin used about 17,000 of the 9.6 kilogram boxes, about 4,000 of the 10 kilogram boxes, and about 250,000 of the 13.6 kilogram boxes. *Id.*

[16] The *World Trade Atlas* data on the record provide the quantity and value of imports under Indian tariff subheading 4819.1001 for each source country. *See Factors Valuations Mem.* Attach. 13.

are crossed off on the *World Trade Atlas* page that Commerce placed on the record. *See Factors Valuations Mem.*, Attach. 13. It appears from the data on the page and Commerce's result that Commerce calculated its carton price of 124.91 rupees per kilogram by excluding the data on imports in these seven crossed-off categories.[17] China and Thailand are two of the three largest source countries of boxes within the subheading. *Id.* Had Commerce used the entire set of *World Trade Atlas* import data on the page, it would have obtained a value of 109.88 rupees per kilogram. The Decision Memorandum does not explain why Commerce excluded data from the seven categories. However, even had Commerce included the data from the seven categories, Commerce's analysis still would be unsupported by the record evidence due to the unsuitability of the import data considered as a whole, as indicated by the apparent variations in the boxes that the import data represent.

Jinan Yipin placed on the record "trade intelligence data" that presents descriptions of merchandise included in Indian tariff subheading 4819.1001. *Jinan Yipin's Surrogate Value Submission* Attach. at 7-8, Ex. 13. These descriptions indicate that the tariff subheading is quite broad in scope.[18] Commerce characterized these data as not concurrent with the period of review

---

[17] According to the datasheet on record, the total quantity of box imports under this subheading for the period of review is 1,473,898 kilograms and the total value of the imports is 184,110,193 rupees. *Factors Valuation Mem.* Attach. 13. The average price calculated by Commerce, 124.91 rupees per kilogram, is based upon the latter values. *Id.* at 12. If imports from China, Thailand, Indonesia, South Korea, North Korea, Finland, and unspecified sources are included, the total quantity of box imports is 2,231,631 kilograms and the total value of the imports is 245,213,759 rupees. *See id.* Attach. 13. The average price using these totals is 109.88 rupees per kilogram.

[18] Included are descriptions for "empty carton boxes," "printed gift boxes for DVD," "gift boxes for C.C.P. with rad layer with radio," "gift boxes+manual+stickers," "rackings '3' boxes for chest freezers," "printed shoe boxes," and "pretty boxes for quickcam expr." *Jinan Yipin's Surrogate Value Submission* Ex. 13.

and insufficiently detailed to support a conclusion that the merchandise covered by the import

data "differ[s] significantly" from Jinan Yipin's garlic packing boxes. *Decision Mem.* at 18. As

discussed previously, however, Commerce's own source of Indian import data, the *World Trade*

*Atlas*, does not support a finding that the Indian import data are reasonably representative of

Jinan Yipin's boxes and is suggestive of wide variations in types of containers. The court,

therefore, would conclude that Commerce's choice of valuation is unsupported by substantial

evidence even if the trade intelligence data were not on the record. Moreover, the trade

intelligence data pertain to a period that overlaps with part of the period of review.[19] The trade

intelligence data lend further support to the court's conclusion that Commerce's valuation

decision is unsatisfactory on this record because it is based on import data that are not reasonably

representative of Jinan Yipin's packing cartons.

Jinan Yipin's surrogate value submission advocated use of a value of 32.38 rupees per

box. *Jinan Yipin's Surrogate Value Submission* Ex. 14 at 1. Commerce's valuation is more than

three times higher; under Commerce's method Jinan Yipin's boxes would be valued at

approximately 111.06 rupees per box.[20] Commerce rejected Jinan Yipin's submission of price

_____

[19] The period of review covers imports from November 1, 2001 to October 31, 2002. The fourth entry in the intelligence data on record shows the date as "July 3, 2002" and is therefore concurrent with the period of review. *Jinan Yipin's Surrogate Value Submission* Ex. 13 at 1. While the year of many of the other entries is not fully legible, the entries follow the months of the calendar year, starting in June and ending in May. *Id.* at Ex. 13 at 1-3. The court concludes that the data contained therein are chronological from June 2002 to May 2003 and partially overlap the period of review.

[20] Under Commerce's analysis, a kilogram of boxes in India should be valued at 124.91 rupees. *Factors Valuations Mem.* at 12. Jinan Yipin used about 17,000 of the 750 gram boxes, about 4,000 of the 800 gram boxes, and about 250,000 of the 900 gram boxes for every cubic ton of garlic packed. *Section D Resp.* Ex. D-8 at 1. Based on this data, the average cost per box, for Jinan Yipin's boxes under Commerce's analysis is 111.06 rupees.

quotes from Indian suppliers of cartons because these quotes were not contemporaneous with the period of review and not representative of a range of prices during the period of review. *Decision Mem*. at 18-19. Defendant attempts to bolster this rationale by also pointing to the fact that the quotes are not derived from a public source. Def.'s Mem. in Opp'n 41. The price quotes, however, are vastly superior to the Indian import data in an important respect: they are specific to the factor being valued. Commerce's rationale concerning the date of the quotes, which were eight months after the close of the period of review, and its rationale concerning the temporal range are not convincing absent evidence of significant price fluctuation in a short time. Moreover, the defendant's argument as to the non-public nature of the quotes is a *post hoc* rationalization not relied upon by Commerce in the Decision Memorandum.

Because the data used by Commerce to calculate the surrogate value were not reasonably representative of Jinan Yipin's cartons and yielded a calculated result that was more than three times higher than the price quotes, the court cannot conclude that Commerce used the "best available information" or that it supported its choice with record evidence or adequate reasoning. *See* 19 U.S.C. § 1677b(c)(1). The court will direct Commerce to reconsider this issue and redetermine the valuation of this factor as applied to Jinan Yipin. Commerce may reopen the record, if necessary, to obtain additional information.

### 4. Shandong Raised Valid Claims Relating to the Surrogate Value of Garlic Seed and Water But May Not Obtain Relief on its Claim Relating to Cartons Because the Record is Deficient in Required Information

In its USCIT Rule 56.2 motion, Shandong seeks relief from Commerce's valuation of its garlic seed, irrigation water, and packing cartons. Shandong did not submit a brief in support of

its motion but instead relies on the arguments of Jinan Yipin. *See* Shandong's Mot. 1-2.[21]

Defendant makes three arguments in opposing Shandong's motion. Defendant first contends that

Shandong's motion violated USCIT Rule 7(f)(1) because, in adopting in full another party's

brief, Shandong fails to set forth its grounds "with particularity." Def.'s Mem. in Opp'n 47.

Defendant then argues that because Shandong did not challenge before the Department the

agency's surrogate value conclusions for garlic seed, water, and cartons, it has failed to exhaust

its administrative remedies. *Id*. at 48-49. Finally, defendant contends that, in the event the court

reaches the merits of Shandong's claims, it should deny relief because Jinan Yipin's arguments

are company-specific and therefore do not show that Commerce's determinations for Shandong's

factors of production are unsupported by substantial evidence. *Id*. at 49.

The court concludes that Shandong's Rule 56.2 motion is sufficiently particular to

comply with the Court's Rules. The court further concludes that Shandong's claims regarding

garlic seed and water are not barred by the doctrine of exhaustion, because Shandong's failure to

raise these claims did not prevent Commerce from actually considering these two issues at the

agency level. With respect to the surrogate factors for garlic seed and water, the court concludes

that Shandong is entitled to a remand because Commerce's determinations do not rest on

findings supported by substantial record evidence and are otherwise not in accordance with law,

and because the record contains sufficient information on Shandong's use of garlic seed and

---

[21] Shandong's motion states as follows: "Shandong Heze agrees with Plaintiff Jinan Yipin of [*sic*] all of the arguments that Jinan Yipin made in paragraphs III, IV and V concerning the valuation of garlic seed, irrigation water and packing cartons, respectively, in its January 10, 2005 Brief in Support of Jinan Yipin's Rule 56.2 Motion. Since all the arguments that Shandong Heze intends to make regarding these three issues would be the same as that in Jinan Yipin's January 10, 2005 Brief in Support, Shandong Heze will not file a Brief in Support of this Rule 56.2 Motion for Judgment upon the Agency Record." Shandong's Mot. 1-2.

water. However, the court concludes that, by application of the exhaustion principle, Shandong is precluded from obtaining relief on the surrogate value of its cartons because it failed to place on the record specific evidence that would have enabled Commerce to conclude that better record evidence existed with which to value those cartons.

In alleging that Shandong's 56.2 motion runs afoul of USCIT Rule 7(f)(1), defendant is challenging the method by which Shandong contests the Final Results–specifically, its adopting arguments in another party's brief rather than presenting its own, independent analysis. The court concludes that Shandong did not violate USCIT Rule 7(f)(1) by adopting in full Jinan Yipin's arguments on surrogate factors. Defendant's citation to USCIT Rule 7(f)(1), a general rule dealing with motions, does not specifically address the issue defendant raises. *See* USCIT R. 7(f)(1). The specific requirements for a USCIT Rule 56.2 motion are set forth in USCIT Rule 56.2(c). *See* USCIT R. 56.2(c). The USCIT Rule 56.2 motion submitted by Shandong is sufficiently particular in that it seeks a remand and a recalculation of the surrogate values for garlic seed, water, and cartons, for the reasons stated in Jinan Yipin's brief. USCIT Rule 56.2(c) does not provide that a party may not rely on another party's arguments in support of its Rule 56.2 motion.

Shandong's failure to challenge before the Department the surrogate value conclusions for garlic seed and water do not require dismissal of its claims. This court has discretion under 28 U.S.C. § 2637(d) (2000) to determine the circumstances under which the court will require exhaustion of administrative remedies. 28 U.S.C. § 2637(d) (the court "shall, where appropriate, require the exhaustion of administrative remedies."); *see Cemex, S.A. v. United States*, 133 F.3d 897, 905 (Fed. Cir. 1998) (reasoning that "'where Congress has not clearly required exhaustion,

sound judicial discretion governs[.]'") (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). The court exercises its discretion to permit Shandong's garlic seed and water claims.

Although Shandong did not raise arguments on garlic seed and water below, Commerce actually considered these issues at the agency level through the arguments of Jinan Yipin and another respondent. *See Decision Mem*. at 3-6, 8-16. Specifically, Jinan Yipin argued that Commerce should value garlic seed using Indian import statistics rather than NHRDF price lists and that Commerce erred in valuing water as a separate input. *Id.* at 3-6, 12-13. The court may excuse a party's failure to raise an argument before the administrative agency if, as occurred in this case, the agency in fact considered the issue. *See Holmes Prod. Corp. v. United States*, 16 CIT 1101, 1104 (1992) (citing *Washington Assoc. for Television and Children v. F.C.C.*, 712 F.2d 677, 682-83 n.10 (D.C. Cir. 1983) (reasoning that "[t]his exception can be seen as a variant of the futility exception, since it would almost surely be futile for a party to raise an objection already made by someone else.")). "[C]ourts have waived exhaustion if the agency has had an opportunity to consider the identical issues presented to the court . . . but which were raised by other parties, or if the agency's decision, or a dissenting opinion, indicates that the agency had the opportunity to consider the very argument pressed by the petitioner on judicial review." *Natural Resources Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (internal quotation marks, brackets, and citations omitted).

In support of its exhaustion argument, defendant cites to non-binding, distinguishable case law. *See* Def.'s Mem. in Opp'n 48 (citing *Rubberflex Sdn. Bhd. v. United States*, 23 CIT 461, 468, 59 F. Supp. 2d 1338, 1345 (1999) (where the court declined to hear certain arguments made by plaintiff because the arguments were not included in the case brief submitted to the

agency) and *Federal-Mogul Corp. v. United States*, 18 CIT 785, 803, 862 F. Supp. 384, 401

(1994) (where the court declined to hear a claim by plaintiff that was not made at the

administrative level)). In contrast to the factual situations in *Rubberflex* and *Federal-Mogul*

*Corp.*, Shandong's garlic seed and water valuation arguments were before Commerce as a part of

Jinan Yipin's case brief. Record evidence specific to Shandong was before the agency regarding

garlic seed, water, and electricity usage as related to water. *See Verification of the Resp. of*

*Shandong Heze International Trade and Developing Company in the Antidumping Duty Admin.*

*Review of Fresh Garlic from the People's Republic of China* at 14-16, Ex. 14, 26 (Jan. 5, 2004)

(Confidential Admin. R. Doc. No. 45) ("*Shandong's Verification Report*"). For example, in its

discussion of garlic in the Decision Memorandum, Commerce noted that, like Jinan Yipin, the

garlic produced by Shandong "had a diameter in excess of five centimeters." *Decision Mem.*

at 10. There is also record evidence on how Shandong acquired its water. *See Letter from Lee &*

*Xiao to Sec'y of Commerce* (July 29, 2003), Attach. 1 at 4-5 (*Second Supplemental*

*Questionnaire*) (Confidential Admin. R. Doc. 23).

For the reasons set forth in the preceding section of the Opinion and Order, the court

concludes that the Department's choice of the NHRDF data on garlic over the import data does

not rest on findings supported by substantial record evidence and is not supported by adequate

reasoning. The court further concludes that the method by which Commerce addressed the

question of irrigation water lacks essential findings of fact and relies instead on mere

assumptions, which find no apparent support in record evidence. Accordingly, on remand, the

court is directing Commerce to reconsider and redetermine its valuations of garlic seed and water

use for both Jinan Yipin and Shandong and to base its analyses of these issue on findings of fact that are supported by substantial record evidence.

The court concludes, however, that Shandong cannot obtain relief on Commerce's valuation of its cartons. When submitting the Indian price quotes, Jinan Yipin stated that "the Department should use these quotes because they are domestic prices, product specific and more representative *of the boxes used by Jinan Yipin and Harmoni*" than the boxes covered by the import data. *Jinan Yipin's Surrogate Value Submission* Attach. at 8 (emphasis added). The record evidence relevant to the question of whether Shandong's cartons were similar to Jinan Yipin's cartons is extremely limited. *See Letter from Lee & Xiao to Sec'y of Commerce* (June 19, 2003), Attach. at Ex. D-2 (Admin. R. Doc. No. 87); *Shandong's Verification Report* Ex. 18 at 1. Shandong did not take the opportunity to direct the court to record information demonstrating that it would have been reasonable for Commerce to use Jinan Yipin's price quotes in estimating the value of Shandong's cartons, such as, for example, information on carton dimensions. Shandong apparently did not place on the record before Commerce any additional information demonstrating that the Indian price quotes obtained by Jinan Yipin are representative of Shandong's packing boxes. In view of these shortcomings in Shandong's claim, the court is unwilling to speculate that the Indian price quotes obtained by Jinan Yipin are reasonably representative of the value of Shandong's cartons. In summary, the court concludes that Shandong failed to exhaust its administrative remedies when it declined to place sufficient information on the record concerning the characteristics of its cartons, and, accordingly, declines to award relief on Shandong's claim pertaining to this factor.

## IV. CONCLUSION AND ORDER

For the reasons discussed above, the court sustains Commerce's decision with respect to the treatment of inspection fees as an indirect selling expense and with respect to the calculation of a surrogate value for Shandong's packing cartons.

The court concludes that Commerce erred in treating sales of Jinan Yipin's merchandise to Houston Seafood that were negotiated on and after March 29, 2002 as affiliated party sales and also erred in invoking its authority to use facts otherwise available and adverse inferences with respect to those sales. Commerce further erred in assigning a rate of 376.67 percent to the two or more sales to Houston Seafood that it found to have been negotiated during the period of November 1, 2001 to March 29, 2002.

The court concludes that Commerce's inclusion in American Yipin's reported total indirect selling expenses of all of Bayou Dock's 2002 salary and benefits expenses was based in part on findings of fact that were not supported by substantial evidence on the record.

The court concludes that the surrogate values that Commerce assigned to Jinan Yipin's and Shandong's use of garlic seed and water, and to Jinan Yipin's packing cartons, were unsupported by substantial record evidence and, with respect to the use of water, lacked findings of fact necessary to the analysis.

Based on the court's conclusions and the foregoing discussion, the court affirms in part and remands in part the Department's *Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 69 Fed. Reg. 33,626 (Jun. 16, 2004), and it is hereby

**ORDERED** that this matter is remanded for further administrative proceedings consistent with this Opinion and Order; it is further

**ORDERED** that Commerce shall redetermine the weighted average percentage antidumping duty margin that it applied in the Final Results to Jinan Yipin's merchandise for the period of review as required in this Opinion and Order and, in so doing, shall not treat as affiliated sales those sales of Jinan Yipin's merchandise to Houston Seafood that were negotiated after March 29, 2002; it is further

**ORDERED** that Commerce shall reconsider its decision to apply the rate of 376.67 percent to the two or more sales to Houston Seafood that it determined to have been negotiated during the period of November 1, 2001 to March 29, 2002 and shall redetermine that rate based on findings of fact that are supported by substantial evidence on the record; it is further

**ORDERED** that Commerce, in redetermining the rate to be applied to the two or more sales to Houston Seafood that it determined to have been negotiated during the period of November 1, 2001 to March 29, 2002, may reopen the record for the sole purpose of determining the beginning date for the employment of Mr. Henry Lee by American Yipin; it is further

**ORDERED** that Commerce shall reconsider its decision to include all of Bayou Dock's 2002 salary and benefits expenses in the calculation of Jinan Yipin's indirect selling expense factor and, in determining a new weighted average percentage antidumping duty margin to be applied to Jinan Yipin's merchandise, shall redetermine the indirect selling expense factor based on findings of fact that are supported by substantial evidence on the record; it is further

**ORDERED** that Commerce shall redetermine the surrogate values of Jinan Yipin's garlic seed, use of water or the energy cost of producing water, and packing cartons; it is further

**ORDERED** that Commerce shall redetermine the weighted average percentage antidumping duty margin that it applied in the Final Results to Shandong's merchandise for the period of review as required in this Opinion and Order and, in so doing, shall redetermine the surrogate values of Shandong's garlic seed and use of water or the energy cost of producing water; it is further

**ORDERED** that in redetermining surrogate values Commerce may reopen the record as necessary to obtain additional information; it is further

**ORDERED** that Commerce shall ensure that all redeterminations are based on sufficient findings of fact and that the findings of fact are supported by substantial record evidence and shall provide on remand the reasons supporting its various redeterminations; and it is further

      **ORDERED** that Commerce shall have one hundred twenty (120) days from the date of this Order to complete and file its remand determination; plaintiffs shall have forty-five (45) days from that filing to file comments; and Commerce shall have thirty (30) days after plaintiffs' comments are filed to file any reply.

 

                                                /s/ Timothy C. Stanceu
                                                Timothy C. Stanceu
                                                Judge

Dated: November 15, 2007
        New York, New York